THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HATTIE YORK, Plaintiff in Error.

*Opinion filed April 23, 1914.*

1. CRIMINAL LAW—*circumstantial evidence must be sufficient to establish guilt to a moral certainty.* While direct and positive evidence is not essential to warrant a conviction, yet if circumstances are relied upon they must be sufficient to establish guilt to a moral certainty, to the exclusion of every other reasonable hypothesis.

2. SAME—*when conviction for murder of new-born child can not be sustained.* A conviction for the murder of a new-born child, claimed to have been given birth by the accused on a certain day, cannot be sustained, even though the evidence is sufficient to establish the fact that the child had been born alive and been suffocated by stuffing cotton in its throat, where the evidence relied upon to show that the accused gave birth to the child at the time alleged is not sufficient to establish that fact beyond a reasonable doubt.

3. SAME—*what circumstances may have hastened the verdict.* That the trial judge in a criminal case was attacked with inflammatory rheumatism after the jury had retired to consider the verdict and thereafter had to be carried in and out of the court room in a chair, and that about the same time one of the jurors was informed that his son had been quite seriously injured by the flywheel of an engine, are circumstances which might have affected the verdict by unduly hastening it.

WRIT OF ERROR to the Circuit Court of Crawford county; the Hon. E. E. NEWLIN, Judge, presiding.

JONES & JONES, and BRADBURY & GAINES, for plaintiff in error.

P. J. Lucey, Attorney General, Joseph B. Crowley, State's Attorney, and George P. Ramsey, (Parker & Eagleton, of counsel,) for the People.

Mr. Justice Farmer delivered the opinion of the court:

Plaintiff in error (hereafter called defendant) was convicted of the murder of her newly-born babe and sentenced to the penitentiary for a term of fourteen years. The indictment charged the murder was committed by suffocating the child with cotton batting thrust into its mouth and throat. Defendant was an unmarried woman about twenty-eight years of age and lived with and kept house for her father. The body of the child was found in the privy vault of defendant's father on August 5, 1912. Defendant, though never married, was the mother of a boy about six or seven years old, and she, the boy and her father were the only members of the family. They lived in the village of Palestine, Crawford county. On Monday, August 5, all three of them went to Terre Haute to visit relatives, and in the evening of that day the body of the child was found. The prosecution sought to prove defendant gave birth to the child on Tuesday, July 30.

Numerous errors are assigned as grounds of reversal. Most of them we think without merit, and as the case must be reversed for reasons hereafter stated it will be unnecessary to refer to them.

The substance of the evidence relied upon by the prosecution is as follows:

Dr. Midgett testified he lived in Palestine and was a practicing physician of ten years' experience. Defendant came to him for treatment about February 9, 1912, and said she had taken cold and missed her monthly period. He gave her medicine to build up her system and correct her monthly period, but it had no effect. After treating her several days he told her it would be necessary to make an examination, to which she consented. Upon a bi-manual

examination he found the uterus enlarged and the neck of the womb shortened, and diagnosed her condition as pregnancy of about three and one-half or four months' standing. He told defendant if she were a married woman he would say she was pregnant, to which she replied she was not a married woman and was not pregnant.

Mrs. Sisson lived next door to the defendant and her father. She testified she noticed in April, 1912, that the defendant was getting larger, and her size increased for probably three months after that time; that the change in size was in her abdomen and breasts; that the last of July she returned to her former shape. On Tuesday morning, July 30, a little before noon, witness went to defendant's house and found her lying on the bed, apparently suffering, clenching her hands, and it seemed difficult for her to talk to the witness. The witness said there was an odor in the room she could not describe, that made her faint and sick. She asked defendant if she could do anything for her, and defendant requested her to put some coal on the kitchen fire, which she did and then went home. The witness was there only a few minutes. She saw defendant once during the afternoon go to the closet, walking slowly, with her hand on her side. Witness again went to defendant's house about six o'clock of the same day and found her lying on a couch in the front room. The witness said she and Mrs. Jennings thought that something had happened at the York home, and after the Yorks left for Terre Haute the following Monday they went to see what they could find, and on looking down in the closet saw a red comfort. This comfort was not proven to have belonged to defendant or her father.

Mrs. Miller testified she lived across the street from the York home and saw the defendant often in May, June and July, 1912. Defendant called at witness' home and witness noticed a change in her and told her it agreed with her to be sick, as she was getting larger. Witness called upon

defendant at her home a few times in the spring when she was sick. On one occasion when witness was at defendant's home defendant vomited in a coal bucket. She testified defendant's waist and bust increased in size, and also that defendant came to borrow a baby dress pattern, and said she wanted it to make a dress for her niece's baby. On Friday after July 30 she returned the pattern. On July 30 witness called at defendant's house and found her sitting in a chair. Witness told defendant she heard she was sick and asked how she was. Defendant said she was better and thought she would be all right the next day. Witness told defendant she looked like she had been sick, and defendant said she thought she was going to die, and that if her father and the witness had not been similarly sick first it would be said she had gotten rid of something. She looked weak and sick. Witness was in to see her again later and found her lying on a couch, but she said she felt better and would be all right the next day. Defendant asked witness to excuse her and went to the closet, but was not gone long. This was on witness' first visit.

Mrs. Jennings testified she lived on the adjoining lot to the Yorks and up to about the last of May or the first of June she saw defendant nearly every day. About the last of May she noticed a change in her form. Her abdomen and breasts were getting larger. This ceased about July 30 and after that defendant was a great deal smaller. The first time witness noticed a decrease in defendant's size was the second of August, when she saw her out sweeping the front walk. After the Yorks had left for Terre Haute, on Monday, August 5, witness and Mrs. Sisson went to the York premises to find the child she said they were positive had been born. They let lighted matches down in the vault of the closet on a hoe and saw something that looked like an old piece of carpet. They found an old red comfort and also the child. They saw its legs and hips.

Edward Jennings, a next door neighbor to the Yorks, testified that on the evening of August 5 he went to the closet of the York home to investigate and found in it an infant. All he could see of it was one leg. He told Mr. Elliott and Mr. Crews and called the coroner. The coroner came and empaneled a jury. The body of the infant was removed from the closet to an undertaking establishment. A comfort was taken out of the closet at the same time the body of the child was taken out. It was not over the child in the closet but was under the body. Witness testified he saw defendant nearly every day during the spring and summer of 1912. About April he noticed a difference in her size, and she kept on increasing in size in May, June and July. She wore a loose mother-hubbard. Witness saw defendant the morning of the fifth of August when she started for Terre Haute, and said she was very slim and wore a tight dress. On cross-examination the witness testified he made it his business to watch defendant as to her size; that he had it in mind all the time and kept watch on her from the month of April.

Seven other witnesses,—four women and three men,— testified to an increase in the size of the abdomen, or both abdomen and breasts, of defendant during the spring and summer and up to about the last of July, and to her decreased size after that time.

Three physicians, graduates of medical colleges and engaged in the practice of medicine twenty, eight and three years, respectively, two of whom were present when the body was taken from the vault, were present and took part in an autopsy on the body of the child. They tested the lungs by placing them in water to see if they would float, and described the appearance of the body and the appearance of the organs, and said the body was that of a well developed child born at the full term, which had lived and breathed. They further gave it as their opinion that the

cotton stuffed in the child's throat and mouth was the cause of death.

Defendant testified in her own behalf that she consulted Dr. Midgett about the middle of January and told him she had taken cold and her menses had stopped. He gave her some medicine and told her to report in three days. He asked her if she would take local treatment, and she said she would if he thought it necessary. He said it was necessary, and after examining her told her there were abscesses on her ovaries. He treated her locally twice a week until February 27, when defendant told the doctor she was no better and did not feel like spending any more money. She said she first missed her menses in January and again in February, but that she had them March 1 and regularly after that. She denied having been pregnant with child at any time in the year 1912, or that she gave birth to a child in July or any other time that year. She denied any relations or intercourse with any man during that time. She heard a rumor about her condition the last of June. The rumor was communicated to her by her sister, Mrs. Fuller, at defendant's home. Witness said she was accustomed to wear, while doing her work, a big, long-sleeved apron, and when her sister told her the rumor she took off her apron and let down her skirt, which was fastened about the waist, so that her sister might see whether anything was the matter with her. The first of July she had her monthly sickness, which lasted three or four days. She testified that on the morning of July 30 she prepared the breakfast, ate with the family, did up the work and ironed until half-past eleven. She had eaten, the day previous, green corn and beans, and the morning of the 30th her bowels began to run off. When she quit ironing she got a bucket of coal and picked some tomatoes for Dr. Zeigler's wife and gave them to her father to take to Mrs. Zeigler. Her father had not been away from the house that morning before that time. About half-past eleven her father

gave her some whisky. She had been to the privy about three times before that and went once in the afternoon. When her father came back she was lying on the bed. Mrs. Sisson came in and asked what was the matter with her, and defendant said she guessed she had eaten too much green beans and corn the day before and had the cholera morbus. The day was warm. She got up and prepared the dinner but did not finish her ironing that day. Mrs. Sisson finished it for her the next day. Defendant was not in bed any more after dinner but did lie down on a sofa or lounge in the front room. When Mrs. Miller came in the afternoon defendant was sitting at the dining table counting what they had made on their garden. She excused herself from Mrs. Miller long enough to go to the closet a few minutes, and when she returned laid down on the lounge. She said Mrs. Miller told her corn and beans had affected her the same way, and defendant said if her father and Mrs. Miller had not been sick before she was, she supposed from the rumors it would be said she had got rid of something. Mrs. Miller left about four o'clock. Defendant got supper about five o'clock, and after supper went out in the garden, dug a bushel of potatoes, and carried them, one-half bushel at a time, twenty-five or thirty steps to a tub. They sold the potatoes the next morning to a Mr. Patton and they were delivered by Burl Gogin, who drove a delivery wagon for a grocery store. After digging the potatoes she washed and then sat on the front porch with her father. She testified John Miller and Mr. Snider were there a little while, and her two sisters and a brother-in-law came,—the two sisters first,—and they sat on the front porch a considerable time. After the visitors went away she gave her father a dose of medicine and prepared for bed. While they were preparing for bed, Mr. Smith, Mr. Flannagan and Mr. Martin called and her father went on the porch and talked with them. She was preparing for bed and could not go out. She sat down in

her room and read to her boy, and was so engaged when
her father came in and went to bed. On Wednesday she
sewed on the machine. There was no change in her form,
that she could discover, during the summer of 1912. She
knew nothing about how the body of the baby came to be
in the closet, or anything about the quilt or comfort taken
from the closet, and testified it was not hers. On Monday
defendant, her boy and her father went to Terre Haute to
visit relatives, and while there received a telegram to come
home on the first train, and on the way home, while wait-
ing for a train at Sullivan, Indiana, she was informed by
an acquaintance why she was asked to come home. On ac-
count of the rumors she had heard about her condition, she
on July 3 went to the home of her niece, Edna Brock, re-
moved the cloth she wore and showed it to her niece for
the purpose of showing she then had her monthly sickness.
On the next day she showed her underclothing on her per-
son to a Mrs. Martin for the same purpose, and she also
showed the cloth she wore to her sister, Mrs. Shears.

There was no proof that the defendant had any male
company for a year before July 30, 1912, and the defend-
ant's father, with whom she lived, and other relatives, tes-
tified she did not associate with or receive the company of
any man or men during that period. She was at home all
the time except when calling on neighbors or friends, and
when she went out almost always had her little boy with her.

Defendant's father testified he was at home with his
daughter all through the summer of 1912 and there was no
change in her size or appearance. He corroborated her as
to what she did July 30. She was sick that day and he
gave her some whisky. He took the tomatoes she gathered
in the garden to Dr. Zeigler and was gone about fifteen
minutes, and when he came back she was lying on the bed.
She only remained there a little while, got up, prepared the
dinner, and after they had eaten and she had done up the
work they sat down at the dining table to count up what

they had made from their garden. While they were doing
this Mrs. Miller came in, and defendant told her she had
eaten some corn which had made her sick, and Mrs. Mil-
ler said it served her the same way. He talked with Mrs.
Miller while defendant went out to the closet, where she
remained a very short time. When she returned he went
out on the porch. After Mrs. Miller left, somewhere about
four o'clock, defendant went to her room, cleaned up a lit-
tle, got supper, and after supper dug a bushel of potatoes.
Witness picked them up in a coal bucket and defendant
carried them to a tub in the yard, twenty-five or thirty
steps distant. The weather was hot. The potatoes were
sold to Mr. Patton the next morning. After digging the
potatoes defendant washed, went out on the porch and sat
with the witness. Mr. Miller came by, and Mr. Snider.
Later the other two daughters of the witness came, and
he and his three daughters sat out on the porch in chairs.
Later in the evening the husband of one of the daughters
came. After the visitors had gone witness and defendant
went in to prepare for bed, and while doing so Martin,
Smith and Flannagan came. Defendant could not go out
to meet them, but witness went out and sat on the porch
with them for a while. Defendant got up at five o'clock
the next morning and prepared the breakfast. Witness
went with defendant and her little boy to Terre Haute the
following Monday.

Defendant's sisters, Mrs. Fuller and Mrs. Shears, and
her niece, Mrs. Brock, testified they heard rumors about
defendant's condition in June. They had been at defend-
ant's father's house several times a week during the sum-
mer and she had been at their homes. All of them spoke
with defendant about the rumors. All testified they ob-
served her closely on account of having heard the rumors.
They testified her size did not increase during the summer.
To Mrs. Shears, Mrs. Brock and a neighbor, Mrs. Martin,

defendant exhibited, in the first part of July, her under-
wear while on her person, and for inspection of two of
them she removed the cloth she wore, and the undergar-
ments and the cloth were bloody, like a woman who had
her menses. Mrs. Fuller testified that when she heard the
rumors in June she spoke to defendant about it. Defend-
ant was at work in her home at the time, and had on a
loose, long-sleeved apron which she usually wore about her
work. Defendant removed her apron to enable her sister
to better observe her size and form, and they had not in-
creased in size or changed. John A. Fuller, defendant's
brother-in-law, testified he saw defendant about four times
a week during the summer, and on account of the rumors
he observed her particularly, and said she did not increase
in size and there was no change in her form. Dr. Zeigler
treated defendant's father, who was sick in July, and vis-
ited him at his home about every two days. He saw de-
fendant on his visits but his notice was not attracted to
her. Burl Gogin, who drove a delivery wagon for a gro-
cery store, was called as a witness for the prosecution, and
testified he had known defendant fifteen or twenty years
and that he went to her father's house every day with or-
ders. Some days he would see defendant and some days
he would not. He did not observe any change in her size
or appearance. The same witness testified he went to the
York home the morning of July 31 and got a bushel of
potatoes for the store and paid one dollar for them. Jesse
Snider testified he lived about one hundred yards from the
York home and passed it nearly every day and saw de-
fendant most every time he went down town. He saw no
change in her appearance between March and August, 1912.
He was at the York home the evening of July 30 and saw
defendant and her father sitting on the porch, and just as
he was leaving, defendant's sisters, Mrs. Shears and Mrs.
Fuller, came. John W. Martin testified he, Henry Smith
and Edward Flannagan went to the York home about nine

o'clock the evening of July 30. They had seen Fuller, his
wife and the other sister of defendant as they were going
home from the York residence and inquired of them how
Mr. York was and whether he was in bed. Witness talked
with no one but Mr. York but saw a woman and a child
in the house. The woman was preparing a bed for some-
one to sleep in. Edward Flannagan testified to substan-
tially the same about the visit to the York home; that they
sat on the porch and talked with Mr. York a few minutes,
and that defendant invited them into the house but they
did not go in.

It is earnestly contended that the *corpus delicti* was not
sufficiently proven; that the evidence is insufficient to show
that the child lived after birth. We think the medical tes-
timony upon this question was competent, and warranted
the conclusion that the child was born alive and had been
suffocated by cotton thrust into its throat and mouth.

The serious question presented is whether the proof was
sufficient to establish, beyond a reasonable doubt, that de-
fendant gave birth to the child. If she did, she must have
given birth to it July 30, and this is the claim of the prose-
cution. This court is always reluctant to reverse a judg-
ment in any case where the evidence is conflicting, on the
ground that it is not warranted by the testimony, and if
this were a civil action we would not hesitate to affirm the
judgment. It is true that in criminal cases the jury are the
judges of the weight and credit to be given to the testi-
mony, and a reviewing court will not substitute its judg-
ment for that of the jury except where the evidence is
so unsatisfactory and inconclusive as to leave a reasonable
doubt of the guilt of the accused. We are not satisfied the
circumstances proven in this case were sufficient to estab-
lish defendant's guilt beyond all reasonable doubt. If the
proof were sufficient to show, beyond reasonable doubt, that
defendant gave birth to a child July 30 the case would be
free from difficulty. The strongest evidence for the prose-

cution that the defendant was pregnant in 1912 is the testimony of Dr. Midgett, but the character of the examination he made, the time he made it and the reasons given for his opinion are not of the most satisfactory or conclusive character. Nor is the testimony of the witnesses for the prosecution as to the increase in size of defendant's abdomen and breasts during the summer of 1912, considered in connection with all the evidence in the case. Defendant had a few years previously given birth to an illegitimate child. This would have a tendency to cause her acts and appearance to be looked upon with more suspicion than would be the case if she had not previously erred. A circumstance testified to by Mrs. Miller, and which evidently excited her suspicion, was the borrowing from her by defendant, during the summer, of a baby dress pattern. A very reasonable explanation, at least, was given of this circumstance by Mrs. Brock, defendant's niece, who testified her baby was born in September of that year and that defendant made all its clothes before it was born. That defendant's size and form did not increase or change during the summer of 1912 was testified to by her father, her two sisters, her brother-in-law and her niece. Two other witnesses in no way related to her and who saw her almost every day testified they saw no change in her size or appearance, and Dr. Zeigler, who visited and treated defendant's father in July several times and saw defendant on the occasion of his visits, did not notice her. One of her sisters, her niece and a neighbor woman testified to seeing her underwear and cloths she wore in the first part of July, from which it appeared she was then having her monthly sickness. That might not preclude the fact of pregnancy, for cases have been known of a pregnant woman having her menses, although such cases are very unusual. The most unsatisfactory and inconclusive part of the prosecution's case is the evidence relied upon to prove defendant gave birth to a child July 30. Upon this question the case

for the prosecution depends upon the testimony of Mrs.
Sisson and Mrs. Miller, the substance of which we have
before set out. Nothing testified to by Mrs. Miller tended
to show defendant had given birth to a child. When she
called on her in the afternoon defendant was dressed, sit-
ting in a chair. She excused herself and went to the closet
once, remained but a few minutes, came in and laid down
on a couch. She was not well, and said that she had been
made ill by eating green corn and beans the day before.
Whether this was the true cause of her illness or not, Mrs.
Miller testified to no fact or circumstance to indicate she
had given birth to a child that day or that she was about
to give birth to a child. It is clear from the testimony
defendant could not have given birth to a child after Mrs.
Miller first saw her, the afternoon of July 30. If she gave
birth to a child that day at all it must have been in the
forenoon. Defendant and her father testified she prepared
their breakfast in the morning and after doing her morn-
ing work began ironing the clothes she had washed the day
before. She admits she became ill during the forenoon
with running off at the bowels and visited the closet about
three times. When Mrs. Sisson called, between eleven and
twelve o'clock, defendant was lying on the bed, and while
it is not so stated directly, it is apparent she was dressed
and had no cover over her. Mrs. Sisson testified defend-
ant appeared to be in pain, clenched her hands, and witness
testified she smelled an odor which made her faint and sick.
Mrs. Sisson remained a very short time, but while there,
at defendant's request, put some coal on the kitchen fire.
Defendant and her father testified that during the fore-
noon, and before Mrs. Sisson's call, defendant, after she
stopped ironing, gathered some tomatoes, which her father
took to Dr. Zeigler's wife. Defendant prepared the dinner
after Mrs. Sisson left, and after the family had eaten and
she had cleaned up the table she and her father sat at the
dining table figuring up what they had made on their gar-

den, and while so engaged Mrs. Miller called. Defendant prepared supper about five o'clock, and after eating went to the potato patch and dug a bushel of potatoes for the grocer, Mr. Patton. Defendant dug the potatoes, her father picked them up and put them in a coal bucket and she carried them, one-half bushel at a time, twenty-five or thirty steps to a tub, into which she put them. The potatoes were called for the next morning by the driver of the grocer's delivery wagon, who paid defendant one dollar for them. Defendant sat out on the porch in the evening with her father and visitors until about nine o'clock. It was not attempted to be shown that after July 30 defendant was ill or incapacitated from doing her housework. Defendant testified she sewed on the sewing machine the next day, and appears to have continued doing her housework up to the time she left for Terre Haute, Monday, August 5. Conceding the evidence does not exclude the possibility that defendant may have given birth to a child on July 30, that is not sufficient to sustain a conviction in a criminal case.

We recognize it to be the province of the jury to determine the weight and credit that should be given to the testimony of any witness or witnesses and their superior advantages over a reviewing court in determining these questions, but the law has not seen fit to make the verdict and judgment thereon conclusive. They are subject to review, and the responsibility at last rests with a reviewing court in determining whether the verdict and judgment were supported by the evidence. "It is only when this court is able to say, from a careful consideration of the whole of the testimony, that there is clearly a reasonable and well founded doubt of the guilt of the accused, that it will interpose on the ground the evidence does not support the verdict." (*Gainey* v. *People*, 97 Ill. 270.) Direct and positive evidence was not required to warrant a conviction, but the circumstances proved must have been sufficient to establish the guilt to a moral certainty and to the exclu-

sion of every other reasonable hypothesis. (*Campbell* v. *People,* 159 Ill. 9.) In that case the court said there was a possibility of the defendant's guilt, but the evidence was not sufficient to prove it beyond a reasonable doubt, and it would be establishing a precedent fraught with danger to sustain the conviction. In *Dunn* v. *People,* 158 Ill. 586, the court said: "In order to warrant a conviction for crime on circumstantial evidence, the circumstances, taken together, should be of a conclusive nature and tendency, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused, and no one else, committed the offense charged." This language was substantially quoted from *Carlton* v. *People,* 150 Ill. 181. It was essential to the case for the prosecution that it be proved defendant gave birth to a child at the time claimed. It was also essential that the circumstances relied upon to establish this proposition should be of such character as to leave no reasonable doubt that defendant did give birth to the child as claimed.

Two circumstances occurred during the trial not of a character to be entitled to much weight in a case where the evidence was sufficient to sustain the verdict but which we cannot say might not have hastened the verdict without full and considerate deliberation by the jury. The trial began on Tuesday and the jury returned their verdict about half-past seven o'clock the Saturday night following. On Thursday or Friday the presiding judge had an attack of inflammatory rheumatism, which continued throughout the trial and was so severe that he had to have assistance in getting in and out of the court room. He was carried in and out in a chair, and it is contended the condition of the judge hastened the jury in arriving at a verdict and prevented a fair and full deliberation. On Thursday, during the trial, a son of Mr. Jeffries, one of the jurors, was injured by being caught in the fly-wheel of an engine. That evening at the hotel one of the officers in charge of the

jury told Jeffries his son had been hurt. The juror wanted
to talk with the man who brought the information, but the
officer would not permit him to do so. The juror was up-
stairs and the officer went down-stairs in the hallway and
talked with the man who brought the news, while the juror
came half-way down the stairs and listened. Some of the
other jurors also heard this conversation. The juror in-
quired if the judge would allow him to go home, and the
man who brought the information of the son's injury said
he would telephone the judge and see. He telephoned the
judge, and then told the officer the judge said the juror
could not go home but he (the judge) would keep in touch
with the boy's condition and report. The juror heard that
conversation. The officers in charge of the jury told the
juror the judge had talked with Dr. Kirk about his boy
and the doctor said he was not badly hurt. The next day,
at the juror's request, one of the officers communicated with
the juror's wife, and she told the officer to tell her husband
that the boy was not so badly hurt as they had thought;
that no bones were broken; that he was getting along all
right and the doctor was not coming back any more. The
jury retired to consider their verdict about 5:30 o'clock
P. M. Soon afterwards they went to the toilet in the base-
ment, then to the hotel or eating house, where they got
their suppers, returned to the jury room and reported their
verdict about 7:30 o'clock, finding defendant guilty and fix-
ing the punishment at the minimum term provided by law.
These circumstances in another case might be entitled to
very little, if any, weight, but considered in connection with
the character of the evidence in this record a serious doubt
is at least raised whether they did not affect the verdict by
unduly hastening it. Upon another trial other facts and
circumstances may be shown that may tend to clear up any
reasonable doubt, one way or the other, and we feel im-
pelled to reverse the judgment and remand the cause for
another trial.                    *Reversed and remanded.*