THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAMAR SANDERS, a/k/a MICHAEL JONES, Defendant-Appellant.

(No. 71-43;

Fifth District—March 10, 1972.

Paul Bradley, of Defender Project, of Mt. Vernon, for appellant.

Mr. PRESIDING JUSTICE EBERSPACHER delivered the opinion of the court:

Lamar Sanders, a/k/a Michael Jones, the appellant hereinafter referred to as defendant, was charged by indictment with armed robbery, was tried before a jury and a verdict of guilty was returned. After a hearing on aggravation and mitigation, the defendant was sentenced to serve not less than three nor more than ten years in the Illinois State Penitentiary. The defendant has brought this appeal, contending the court erred

in allowing the identification testimony to stand, and that he was not proven guilty beyond a reasonable doubt.

On the 14th of November, 1969, at approximately 7:30 P.M. the Tri-City Grocery on St. Louis Street in Edwardsville, Illinois was the scene of a robbery. Twenty-one hundred dollars was taken from Mrs. Margaret Schmidt. She was the cashier of the grocery store and the only eyewitness to the robbery. Mrs. Schmidt described the men who entered the store's office as Negroes, one about 5'8" in height and heavy—about one hundred and ninety pounds. The other individual was smaller—about 5 feet to 5'2" in height and weighing about one hundred pounds. She further described the smaller individual as wearing a black felt hat, blue shirt, dark trousers, and a black three-quarter length coat. She testified that the smaller of the two men pointed a gun at her and demanded the money. After taking the money, the two men left the store, at which time Mrs. Schmidt called the police.

The store manager, Mr. Ed Nelson, then testified that he was told by Mrs. Schmidt of the robbery, at which time he ran out of the store after the assailants. He stated he saw a white or gray, 1963 or 1964, Chevrolet automobile with two people in it. The two in the car then left the car and ran. Later he saw three men run across the road. Mr. Nelson returned to the store after hearing a noise which he thought to be a shot. Mr. Nelson could not identify the persons running, other than that they were of "the colored race".

Another witness, Mr. Kenneth Erb testified that he saw three men in the car and three men running after the automobile began to stall. He also testified to hearing a noise which sounded like a shot. He also could not identify the men except that he believed them to be Negroes.

A short time later Officer Epperson of the Edwardsville Police Department arrived upon the scene. Officer Epperson stayed with the car until Madison County Deputy Sheriff Rizzi arrived. Deputy Rizzi dusted the car for fingerprints. A disposable Falstaff quart bottle, a one-half pint bottle of Old Crow Whiskey, and one dollar bill were removed from the front seat of the car. The removed items were turned over to Officer Connor who subsequently delivered them that night to Edwardsville Chief of Police, Robert Dillon.

The defendant was arrested by Officer Connor the same evening of the robbery at about 10:20 P.M. At the time of his arrest the defendant was wearing pale blue trousers, a dark three-quarter length coat, and a camouflage type hat. Immediately after being taken to the police station, the defendant was fingerprinted by Officer Trever. The prints were also delivered that night to Chief Dillon. The items removed from the

automobile and the fingerprints were sent to the F.B.I. and received back by the Police on December 8, 1969.

Shortly after 10:00 P.M. on the night of November 14th, the Police contacted Mrs. Schmidt at a bowling alley, picked her up and brought her to the police station to see if she could identify the defendant and another individual who had been similarly arrested, and was also in custody. Mrs. Schmidt viewed the suspects through a one-way mirror into the Chief's office. The two were brought into the office one at a time. Mrs. Schmidt identified the defendant.

The F.B.I. report on the fingerprints identified one print on the Falstaff bottle as belonging to the defendant. There were no other identifiable prints.

The defendant testified that he was at a tavern in Edwardsville at the time the robbery occurred. An attorney testified that he had given the defendant a ride to the tavern after seeing him at a hardware store. Olivia Townsend, the tavern owner, also corroborated defendant's testimony stating that she saw him in the tavern between 7:30 and 8:00 P.M. on the evening of the robbery.

A State's witness testified that on the night of the robbery he talked with someone who was in the abandoned automobile. He stated that he did not see the defendant in the car or in the parking lot when the man he was talking to began to run.

There was also testimony from the defendant, Mrs. Schmidt and Chief Dillon that at the time the defendant was brought to the Chief's office (for identification) the Falstaff bottle was sitting on the Chief's desk. The defendant testified that he touched the bottle while on the Chief's desk. Chief Dillon and Mrs. Schmidt testified that they did not see the defendant touch the bottle but that the Chief did ask the defendant not to touch the bottle. Mrs. Schmidt did testify, however, that she did see one of the suspects reach for the bottle.

Finally the defendant testified under cross-examination that his height was 5'6" to 5'7" and that his weight at the time of arrest was between one hundred and thirty to one hundred and thirty-five pounds.

The defendant made timely objection to Mrs. Schmidt's testimony identifying the defendant. The court reserved its ruling and the testimony was allowed to stand, after a hearing out of the presence of the jury, from which the court apparently determined there was an independent origin for the in-court identification. Defendant's objection was renewed and preserved for appeal by the post trial motion.

The defendant urges that the court below erred in denying defendant's motion to strike the identification testimony of Mrs. Margaret Schmidt.

The appellee has failed to file a brief and thus we are not aware of the arguments that the State may have brought in opposition to the appellant's assertions. The burden that the defendant in the case must overcome in order to prevail in his argument is set forth in *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152. Referring to *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct., 1967, 18 L.Ed.2d 1199, our Supreme Court said:

"We believe that *Stovall* requires that a defendant so claiming must prove that 'the confrontation conducted * * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.' 388 U.S. at 301-2, 18 L.Ed.2d at 1206, 87 S.Ct. at 1972." (40 Ill.2d at 150.) If an accused can support this claim the evidence of identification is rendered inadmissible and not simply affected as to credibility. (See *Gilbert v. California*, 388 U.S. 263, 272-3, 18 L.Ed.2d 1178, 1186-7; *Stovall v. Denno*, 388 U.S. 293, 299-300, 18 L.Ed.2d 1199, 1205; *People v. Caruso*, 68 Cal.2d 183, 436 P.2d 336, 341, Note 3.) Prior decisions of this court, to the extent they are contrary, are to be considered as having been overruled." 42 Ill.2d 511-12, 250 N.E.2d 154.

■■ The practice of showing suspects alone has been and is widely condemned. *Stovall v. Denno, supra.* However, not every individual viewing must, by necessity, be considered as a denial of due process when there are other justifying or saving circumstances. *People v. Wright*, 124 Ill.App.2d 223, 260 N.E.2d 265; *People v. Bracey*, 129 Ill.App.2d 57, 262 N.E.2d 748.

■■ The question here is whether the totality of the circumstances surrounding the identification was such as to deny to this defendant the constitutional safeguard of his right to due process of law. The law does not require a line-up in all circumstances. (*People v. Bracey, supra; People v. Brinkley*, 33 Ill.2d 403, 211 N.E.2d 730; *People v. Hill,* 121 Ill.App.2d 377, 257 N.E.2d 602.) We are, however, in this case without any explanation as to why the defendant was not made to appear in a line-up. There is an absence of showing as to why or what justification existed for the viewing as it was performed. The record does not indicate that Mrs. Schmidt's identification of the defendant was clear, convincing and untainted or of an independent origin. *People v. Blumenshine, supra.* Here the one-man show-up was conducted approximately three hours after the robbery at a time while she was still nervous and excited by the incident. She had never before been the victim of a crime. Even at the trial, both before the jury and out of the presence of the jury, after she had been told that hearing would be held to determine if she had an independent recollection outside of the show-up, and she had discussed her testimony with the prosecutor, she was confused about de-

fendant's head covering at the time of the robbery. Before the jury she testified "he had on a black felt hat" and "he was wearing a man's black hat which looked like it was felt with a narrow brim, and was like a dress hat"; at the hearing to determine whether she had an independent recollection she testified "he had a black cap". She testified that at the show-up he had on different clothes including "a hunting hat. It was a cap like hat". The arresting officer and other officers testified that at the show-up he was wearing a camouflage hat that could be described as a hunting hat or cap like hat, and there was circumstantial evidence from which it could be inferred that defendant had had an opportunity to acquire a different head covering between the robbery and his being taken into custody.

But, more convincing of the possibility of her being in error in her identification of defendant was her description of defendant's size and weight. The record is uncontradicted that defendant was five feet six or seven inches tall and weighed between 130 and 135 pounds. Mrs. Schmidt testified that she was five feet five and one-half inches tall, and that the shorter of the two robbers, which she identified as this defendant, was five feet or five feet two inches. She did not recall what description she gave the police but in answer to inquiry as to what description she gave the police both before the jury and at the hearing out of their presence she testified that the smaller of the two robbers, whom she identified as defendant, was five feet or five feet two and weighed about 100 pounds, and in the latter hearing, stated that it was her impression that the smaller of the two was shorter than she, even with his hat on, and "I know that he wasn't as tall as what I am". Although at the hearing out of the presence of the jury, she testified that she recognized him at the police station "because of his size and his face" and on cross examination "mostly his face". At no time did she describe his face or any facial characteristics and when asked what it was about his face that she recalled from the robbery said she didn't know how to answer. While she admittedly may have given the police varying descriptions, all of her testimony at the trial was to the effect that the smaller of the two robbers, whom she identified as defendant, was shorter than she and was in fact five feet or five feet two inches, and none of her reports to the police varied from the fact that he was smaller than she.

■■ In our opinion the defendant has met the burden that is required by *Stovall v. Denno, supra,* in that the totality of the circumstances "was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law". See also *People v. Botulinski,* 383 Ill. 608, at 614-616, 50 N.E.2d 716 in which the Court said at 614-615:

"A conviction cannot be said to be sustained by evidence beyond a reasonable doubt if the testimony of the witnesses shows that their identification of the person accused was vague, doubtful and uncertain, *People v. Christocakos*, 357 Ill. 599; *People v. Fiorita*, 339 Ill. 78.

We have also held that direct evidence either of identification or of any other fact is not required in order to sustain a conviction. However, the court has said that where circumstantial evidence is relied upon the facts and circumstances proved must be sufficient to establish the guilt of the person accused to a moral certainty and to the exclusion of every other reasonable hypothesis. *People v. Christocakos*, 357 Ill. 599; *People v. York*, 262 Ill. 620."

Since, from the record there is a reasonable doubt that defendant was the robber and there appears to be no identification testimony upon which a conviction could stand, we reverse.

Judgment reversed.

G. MORAN, J., concurs.

Mr. JUSTICE JONES dissenting:

I agree that the one man show-up as conducted at the police station approximately three hours after the robbery was suggestive and unwarranted under the circumstances and that under the authorities cited the testimony of the complaining witness regarding the identification of the defendant at the show-up should be suppressed. The majority have found that the show-up at the police station was so suggestive that it influenced the identification by the complaining witness to such an extent that it deprived defendant of due process of law. The majority state, "The record does not indicate that Mrs. Schmidt's identification of the defendant was clear, convincing and untainted or of an independent origin." The majority conclude their opinion by stating, "* * * there appears to be no identification testimony upon which a conviction could stand * * *."

I disagree with the findings and the conclusion reached by the majority and must respectfully dissent.

Following the case of *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152, it has become firmly established, consistent with Federal authorities, that an in-court identification may be admissible, even when the pre-trial identification is not proper, if it is shown by clear and convincing evidence that the courtroom identification had an independent origin arising from an earlier uninfluenced observation of the defendant. (*People v. Martin*, 47 Ill.2d 331, 265 N.E.2d 685; *People v. Perry*, 47 Ill.2d 402, 266 N.E.2d 330; *People v. Davis*, 126 Ill.App.2d 255, 261 N.E.2d 771.)

Granted that the one man show-up at the police station was unwarranted, suggestive and properly suppressed, was there an independent origin for the in-court identification made by the robbery victim in this case?

When called as a witness by the People the complaining witness testified that she was the head cashier for the Tri-City grocery store and in charge of the office. She was on duty at 7:30 on the evening in question. While putting the store stamp on checks she heard a noise and looked around and saw two colored men walk into the office. The first to enter was about five feet eight inches and was heavy. He said something to the effect "give us money, give us all of it." She turned around halfway and saw the other fellow come around him. The smaller one (the defendant) was more or less facing her. (She then made an in-court identification of defendant.) At that time he had on a black felt hat, a man's hat, a blue shirt, dark trousers, and a black sort of like raincoat or all weather coat, long like a top-coat or a three-quarter length. When he walked in up around the other fellow he had a gun and he pointed it at her. She did not remember exactly what he said but knew they wanted money. He pulled the drawer open and then reached in and took it. The one with the gun started backing down the steps and said "keep quiet" or something like that. She has never been able to identify positively the heavier person. She has identified the smaller one as Michael Jones (defendant). On cross examination complaining witness testified that she had never seen defendant prior to the robbery but saw him later on that evening at the police station. The police picked her up at a bowling alley while she was participating in a contract meeting and took her to the police station to see if she could identify these two fellows. They had brought mug shots to the store earlier in the evening but defendant's picture was not in the group. She also stated she first talked with the police officer about what occurred at about 7:30 just a few minutes after it happened. She described defendant as about five foot or five foot two inches and about one hundred pounds and again stated that when he was in the store he was wearing a man's black hat which looked like it was felt, with a narrow brim and was like a dress hat and he was not wearing any kind of glasses. He had on a black coat about three-quarter length outer garment. The closest point the five feet two individual would have gotten would have been within three feet.

The trial court conducted an in camera hearing for the purpose of determining whether or not the complaining witness had an independent source for her in-court identification of the defendant. The hearing was prompted by defendant's motion to suppress all the identification testimony given by the complaining witness. The complaining witness was questioned extensively during the in camera hearing. She testified that

the office was "pretty light," that there are several rows of florescent lights running the length of the store and it would have been brighter than the courtroom. She first observed the smaller of the two when they walked into the office. She turned about halfway and was facing the smaller one. He had a black cap and "three-quarter length like topcoat." Blue shirt and dark trousers. He then walked up around the heavier fellow and she and defendant were standing almost face to face. He was in that position about one minute. She had never seen this person before. On cross-examination she stated that when she viewed the defendant at the show-up he was then wearing a hunting hat, avocado with orange or yellow or beige mixed it, and he had on a blue shirt and blue trousers and the same black coat. The cross-examination continues as follows:

"Q. These are not the same clothes you had previously seen him in are they?

A. No.

Q. In what manner and way did you know this was one and the same person?

A. Because of his size and face.

Q. Now, when you were testifying from the stand were you testifying from your mind as you vizualized the individual the night of November 14, 1969 at seven thirty in the evening?

A. At the store, yes.

Q. And is this man who is personally in the courtroom the person in the Tri-City store that night?

A. Yes.

\* \* \*

Q. And did that view at the police station effect [sic] your testimony as to his identification at the trial yesterday?

A. I knew when I seen him at the police station that night he was the same person who had been in the store earlier and I knew yesterday he was the same person that was in the store that night.

\* \* \*

Q. When you testified that you may have given varying descriptions as she just read back in your answers, what did you mean by that?

A. Well, my judgment is poor. I could guess someone as being five foot eight and they could be five foot ten, but I am five foot five and one half inches and I knew that he wasn't as tall as what I am.

Q. So that the person that held up the store was not as tall as you were?

A. *I didn't think he was although he had on a hat.* (Emphasis supplied.)

Q. So that the thing you recall that was the same about these two individuals or the individual who you have identified was his face and his size?

A. Right. Mostly his face.

＊　＊　＊

Q. Did the view you had of him at the police station effect [sic] at all the positiveness of you [sic] identification of him now?

A. No."

The only inconsistency in the testimony of the complaining witness relates to the size of the defendant. She testified that defendant was shorter than she but qualified this by acknowledging she had poor judgment on height and she did not think defendant was as tall as she was *"although he had on a hat."* (Emphasis supplied.) The testimony of defendant's alibi witnesses, an attorney and a barmaid, which placed him in a hardware store and a tavern at about the time of the robbery is entirely reconcilable with defendant's participation in the robbery. The alibi aspect of the unquestioned presence of the defendant at the hardware store is particularly suspect since he appeared in a line at the cash register but, according to the attorney, left the store without any packages and the time would or could have been immediately following the robbery about three blocks away.

To consider the evidence set forth above and then decide, as a matter of law, that there is no clear and convincing evidence that the courtroom identification of defendant had an independent origin arising from an earlier uninfluenced observation of the defendant is to ignore legal precedent and discard common sense. In my opinion, not only is there sufficient, there is an excess of evidence from which it could be found that there was indeed an independent origin for the in-court identification of defendant and that the trial court was correct in its finding, made following the in camera hearing, and the verdict and judgment of the trial court should be affirmed.

Appropriate here is the comment of the Supreme Court in *People v. Davis,* 45 Ill.2d 514, 261 N.E.2d 314, "Clearly the trial court considered that the identification of the defendant was based on observations of the defendant made by the witnesses independent of their having viewed him at the police station." While it is true that where a conviction rests upon an identification which is doubtful, vague, and uncertain, it will be reversed. (*People v. Gardner,* 35 Ill.2d 564, 221 N.E.2d 232; *People v. Cullotta,* 32 Ill.2d 502, 207 N.E.2d 444.) However, this is a question for the trier of fact whose duty it is to consider contradictory testimony and determine the credibility of the witnesses and the weight to be accorded their evidence. (*People v. Coulson,* 13 Ill.2d 290, 149 N.E.2d 96; *People*

*v. Davis,* 126 Ill.App.2d 255, 261 N.E.2d 771.) It is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses. *People v. Novotny,* 41 Ill.2d 401, 244 N.E.2d 182.

The majority are concerned with the discrepancies in the identification testimony of Mrs. Schmidt. But discrepancies and inconsistencies in the testimony of identification witnesses are neither new nor unique in our law. They are properly resolved by the trier of fact along with other matters going to the weight and credibility to be accorded witnesses. To cite but one example, particularly germane here, the case of *People v. Watkins,* 46 Ill.2d 273, 263 N.E.2d 115, was a case where a jury's determination of guilt was allowed to stand despite the fact that a police officer who had been shot by defendant initially described his assailant as being six foot two inches tall and weighing one hundred eighty pounds with a natural hair style but defendant proved to be five foot eleven inches tall weighing one hundred forty-five pounds with processed hair, a moustache and a faint goatee.

On the basis of the record presented in this case I would affirm the trial court. But absent outright affirmance the case should be remanded for a new trial in which evidence of the improper one man show-up is withheld from the jury.