THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HOWARD L. ALLENDER, Defendant-Appellant.

(No. 72-99;

Fifth District—November 21, 1975.

KARNS, J., dissenting.

Stephen P. Hurley and Ann L. Carr, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert E. Murphy, State's Attorney, of Waterloo (James W. Jerz and Martin P. Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Monroe County entered after a jury verdict of guilty of attempt burglary. The principal issue is whether a pretrial identification procedure denied defendant due process of law.

The chief prosecution witness, an Illinois State trooper, testified that he observed the defendant at the scene of the offense. Subsequently, after finding another participant in the offense in a truck marked with the lettering "H. L. Allender," the witness requested a photograph from the St. Louis County Police Department of the person whose name ap-

peared on the truck. After looking at the photograph, the witness determined that the man whose picture he had received was the same man he had observed at the scene of the offense. At the time of trial the witness identified the defendant as the person he had observed at the scene of the offense. Defendant argues that the photographic identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. He claims the basis of the trooper's identification was not his view of the suspect at the scene but the suggestive influence of the photographic identification procedure which he used.

■■ The determination of this issue requires a review of those cases involving suggestive pretrial identification procedures. In *Simmons v. United States,* 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967 (1968), the Supreme Court considered questions arising where witnesses were shown photographs in the investigative process to determine possible suspects where no person had been taken into custody or charged with the offense. Noting the necessity of prompt identification of possible suspects following a crime, the Court refused to prohibit such a procedure as a matter of constitutional requirement, but stated that each case concerning such technique must be determined upon its facts and that convictions based upon eyewitness identifications at trial following pretrial recognition by photograph "will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. 377, 384, 19 L.Ed.2d 1247, 1253, 88 S.Ct. at 971.

Additional guidelines as to the relationship between suggestiveness and misidentification were announced in *Neil v. Biggers,* 409 U.S. 188, 198, 34 L.Ed.2d 401, 410-11, 93 S.Ct. 375, 381-82 (1972), where the Supreme Court stated that

> "It is the likelihood of misidentification which violates a defendant's right to due process * * *. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."

Illinois courts, while granting recognition to the use of photographs as a beneficial tool in the investigation of criminal activity, have held that "identification procedures in which an accused is exhibited to a witness alone, in the absence of any justifying or saving circumstances, are so improperly suggestive as to amount to a denial of due process." *People v. Carruthers,* 18 Ill.App.3d 255, 263, 309 N.E.2d 659; *People v. Sanders,* 4 Ill.App.3d 494, 280 N.E.2d 269.

Our Supreme Court has recognized four "justifying or saving circumstances" which might render an otherwise suggestive identification procedure nonreversible error: Where the victim is in the hospital and may not survive; where the identification witness had an excellent opportunity to observe the suspect; where the suspect was known to the witness prior to the crime; and where the suspect has uncommon distinguishing characteristics. *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152, 154.

These exceptions indicate that, even though a pretrial confrontation is tainted or even grossly suggestive, in-court testimony of an identifying witness will still be admissible so long as the record clearly reveals that the witness's prior observation of the defendant is sufficient to serve as an independent basis for in-court identification. (*People v. McMath*, 45 Ill.2d 33, 256 N.E.2d 835.) See also *People v. Rodgers*, 53 Ill.2d 207, 290 N.E.2d 251, which held the identification of the defendant from a single photograph, approximately two years after the crime, did not deny due process where the identification was based on an excellent opportunity to observe the defendant at the time of the crime.

■■ Under the applicable Illinois case law, we conclude that the use of a single photograph by the State trooper in his identification procedure was unnecessarily suggestive. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one is available. Clearly, the police could easily have added several police photographs to the one shown the trooper. That Allender's name was printed on the truck in which a participant of the offense was found would very likely predispose the trooper to identify the single photograph of Allender requested and supplied by the St. Louis County Police Department, especially in light of the weak evidence surrounding the initial identification.

■■ We turn, then, to the question whether under the totality of the circumstances the identification procedure was reliable even though the confrontation procedure was suggestive. Factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 34 L.Ed.2d 401, 411, 93 S.Ct. 375, 382.

The facts underlying this appeal indicate that on August 20, 1970, near midnight, the State trooper drove to the south side of the Columbia Equipment Company building. He stopped in front of the garage door,

looked through the window, and noticed a window on the east side of the building open and broken. He saw two men at that window and reported a burglary in process.

The State trooper testified there were fluorescent lights on inside the building and that for a total of 10 to 15 seconds he got a good view of the men's chests, shoulders, and heads. He was 30 to 40 feet from them and nothing, not even the security of bars attached to the window frame, blocked his view. The man on the left had his head and shoulders completely inside the building and the man on the right, later identified as defendant Allender, was standing in a crouched position under the open windows outside the security bars facing northwest. Testimony also revealed that iron bars were placed on the garage door and the window frame through which the suspects were attempting to enter, indicating an added obstacle to the trooper's view. In addition, defendant Allender was standing in a crouched position under the open windows outside the security bars thereby making him less noticeable to the on-viewing trooper.

On cross-examination the trooper testified that the eyes, nose, mouth and forehead were essential to an identification, but no specific description was ever given by him. He further testified on cross-examination that the window on the garage door, through which he observed the suspects, was cloudy and murky from fumes and that the area was "fairly well" lit. The suspects, after sighting the trooper, fled in separate directions. The trooper ran to the back of the building and saw one of the men run southeast and the other run directly north. He testified that there was a mercury-vapor dusk-to-dawn light on the telephone pole at the southeast corner of the building and a shielded light so that it was very bright. He ordered the man running southeast to stop and fired a warning shot. Upon firing a warning shot, the defendant turned around, dropped a crowbar, and fled. This occurred at a distance of approximately 60 feet from where the trooper was standing.

The trooper testified that he could see the defendant from the waist up when he dropped the crowbar, but a cornheader between them blocked the rest of his view. On direct examination he testified that he had no trouble viewing the man because the area was fairly well lit with overhead lights. On cross-examination, however, he testified that there was no light in the area where the defendant was and that he was 60 to 70 feet from the defendant when the defendant dropped the crowbar.

The trooper made an in-court identification of the defendant Allender as the man who had dropped the crowbar and the man who stood at the right in the window. He said, however, that on the night of the attempt Allender had hair that came down the side of his forehead,

whereas now, in court, he had a crewcut. In cross-examination he testified that the person with the crowbar may not have been defendant Allender.

The trooper also testified that a shot was fired at him during the second viewing of defendant. He stated on cross-examination that there almost had to have been a third person because the shot fired came from a gun which was never found. When asked if defendant Allender could have been the possible third person, the witness said, "In the dark, yes sir, I don't know."

About ten minutes after the man identified as Allender escaped, the trooper heard a truck start up. He and the Columbia, Illinois, Chief of Police, who in the meantime had arrived at the scene, stopped the truck and placed the driver, Leroy Eldridge, under arrest. The trooper identified Eldridge as the man who was at the left in the window of the building. At this time the trooper and the chief of police noticed one-inch gold letters on the side of the truck which read "H. L. Allender, St. Louis, Missouri."

The police continued to canvass the area looking for the gun which had been fired from the north. The trooper testified that he found a revolver lying near the pickup truck, but it was fully loaded and had not been fired. He said there almost had to have been a third person who was never found.

The crowbar that had been dropped and the gun found by the truck were taken into possession, but no fingerprints were found on either. The trooper testified that when defendant Allender heard he was being sought by police, he turned himself in.

Four witnesses testified that defendant Allender and three other men had left home about 5 p.m. on August 20, to go fishing at Lake of the Ozarks in central Missouri and that they had stayed there until the 23 of August. These witnesses and defendant's wife testified that defendant had not worn his hair long during the time of the offense. Furthermore, defendant's wife testified that their truck had been loaned to a friend at the time of the offense.

The State attempted to impeach the testimony concerning the length of defendant's hair by introducing the photograph sent from the St. Louis County Police Department, taken on October 19, 1969, showing defendant with a haircut other than a crewcut.

Additional evidence establishes that Ralph Frillman, a professional photographer, took pictures approximately one year after the attempted burglary. Simulating the conditions, Frillman was unable to identify either by photograph or his naked eye a person placed in positions of the defendant as occurring the night of the attempted burglary. Frillman testified that he had 20-20 vision.

The Columbia Chief of Police was also present the night the photographs were taken by Frillman. On cross-examination the chief testified that the lighting conditions were as good as those of the night of the attempted burglary. He also testified that the windows on the garage were cloudy and that he could not recognize, under simulated conditions, the defendant's attorney standing behind the window where the suspects stood.

The crowbar carried and dropped by the defendant did not reveal any fingerprints. Furthermore, it was approximately ten hours after viewing the suspects and the gold letters "H. L. Allender" on the truck that the single photograph, which the trooper knew to be H. L. Allender, was observed.

The totality of these facts support the conclusion that the trooper had far less than an excellent opportunity to observe the defendant at the time of the crime and that no uncommon distinguishing characteristics were the principal means of identification. Nor do the facts indicate any other "justifying or saving circumstances" which would reveal that the witness's prior observation of the defendant was sufficient to serve as an independent basis for in-court identification.

■■ For these reasons, we conclude the photographic identification procedure used by the trooper to aid in his identification of the suspect was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and that there was an insufficient basis for the in-court identification. It will, therefore, be unnecessary to consider other issues raised by defendant on this appeal.

Accordingly, the judgment of the circuit court of Monroe County is reversed.

Judgment reversed.

EBERSPACHER, J., concurs.

Mr. JUSTICE KARNS, dissenting:

I must respectfully dissent from the opinion of the majority.

A review of the record convinces me that notwithstanding any infirmity in the investigative photographic procedure employed, there was a positive in-court identification, independent of any suggestive, improper photographic identification.

State Trooper Brueggemann testified he had two opportunities to view the defendant at the scene. The interior of the building was lighted and the exterior was illuminated by two flood lights and two dusk-to-dawn mercury-vapor lights. The trooper testified he was able to observe the defendant and his companion at the rear window of the building for a

period of 15 to 20 seconds, unobstructed by the security bars on the window and that he and defendant faced each other face-to-face after the officer ordered them to halt. He testified he had a "good view" of both defendants and their faces and shoulders were above the security bars on the tilted window. An identification by one witness, if positive and credible, is sufficient to convict. (*People v. Stringer*, 52 Ill.2d 564, 289 N.E.2d 631 (1972).) Considering the lighting and the opportunity to observe, I find nothing improbable or incredible in the trooper's identification of defendant.

Defendant's alibi defense is hardly worthy of belief. He did not testify but his wife and friends testified he had loaned his automobile to Leroy Eldridge, and gone on a fishing trip to Lake of the Ozarks, Missouri. Conveniently, the trip was a camping trip to a remote part of the lake where defendant and his friends coincidentally were not seen by any independent, disinterested witnesses. These witnesses were impeached in an important detail. They denied that defendant had ever worn his hair as Trooper Brueggemann had testified he appeared at the time of the crime. On rebuttal they were effectively contradicted by a photograph of defendant taken approximately nine months prior to the date of the attempt which clearly supported the officer's testimony. The photograph was the same photograph employed by Trooper Brueggemann in his investigation.

More incredibly, the majority find the trooper's photographic identification of the defendant impermissibly suggestive under the rule developed in *Simmons v. United States*, 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967 (1968), which was concerned with police displaying photographs to lay eyewitnesses. There the Court certainly did not disapprove of the police obtaining photographs of suspects, and in fact, the opinion observed that the police must obtain photographic identification with dispatch to determine if they are on the "right track."

The majority ignores the fact that the trooper obtained the photograph in the course of his investigation as a police officer at the scene of the burglary. The codefendant was apprehended at the scene inside a truck with the name "H. L. Allender, St. Louis, Missouri" lettered on the sides. He immediately sought to obtain a photograph of Allender. If the photograph was not of the person he had seen outside the building, Allender would have been cleared as a suspect, but could be expected to furnish information as to the whereabouts of his truck. If Allender was the person observed, further investigation for possible suspects was unnecessary. In short, obtaining the photograph was part of the routine investigation of this crime. In my opinion, the officer would have failed in his duty as a law enforcement officer if he had failed to obtain the photograph.

The reasoning of the majority that equates this investigative procedure by a trained police officer, with over 22 years' service with the Illinois State Police, with photographic identification by lay eyewitnesses is illogical and not based on precedent.

> "The exhibition of the photographs constituted a part of the normal investigative procedures looking toward discovery of a culprit and his apprehension. This court cannot lose sight of the fact that people who are the victims of crimes of this sort have rights which must also be protected, namely, that orderly investigative procedures must be inaugurated promptly without delay and must proceed without diversion from their purpose to find the guilty person as soon as possible before recollections become hazy and the enthusiasm of pursuit is diverted by subsequent intervening events of a distracting nature." *People v. Watkins*, 46 Ill.2d 273, 278, 279, 263 N.E.2d 115, 119 (1970).

The majority lends credibility to a patently spurious alibi, which the jury did not believe, and treats the testimony of a State police officer as unworthy of belief. I would not do so.