(No. 41986.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
ROBERT MARTIN, Appellant.

*Opinion filed Nov. 17, 1970.—Rehearing denied Jan. 27, 1971.*

WARD, J., took no part.

BELLOWS, BELLOWS & MAGIDSON, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and GEORGE ELSENER, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

On August 14, 1966. the defendant, Robert Martin, and codefendant, David Banach, were jointly indicted for armed robbery of a tavern on October 13, 1965, in Burnham, Illinois. On October 14, 1966, Banach pleaded guilty and was sentenced to a term of one to five years in the penitentiary. The defendant herein was arrested in California on June 7, 1967, returned to Illinois in September and, in a jury trial in the circuit court of Cook County in January 1969, was tried, convicted, and sentenced to a term of not less than 5 nor more than 15 years in the penitentiary.

Defendant, appealing this conviction, contends that he was not proved guilty beyond a reasonable doubt, and that, in any event, his constitutional rights were violated by several in-court identifications which were the products of

identification procedures so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable mistaken identification.

The tavern was robbed, as well as the patrons, by two armed men at about 12:30 A.M. They had entered the tavern about midnight, ordered two drinks, played a bowling machine and then with guns drawn announced a stickup. The bartender, George Kenney, testified that he observed defendant closely as he served him a drink across the bar, as he played the bowling machine, and then later when defendant pulled his gun, announced his purpose, and ordered him and the customers into the washroom. He also saw and heard defendant place a gun to the head of a protesting customer, William Murn, ordering him to place his billfold, as well as his money, on the bar. When he and the customers were confined to the washroom, he said defendant called him out, inquired whether any guns were kept in the tavern and, when told there were none, defendant threatened to blow his head off if he had lied.

William Murn testified he first noted the robbers when the stick-up was announced and everybody was ordered to the washroom. He was about 10 to 12 feet away from defendant at the time. When he attempted to place his money on the bar and not his billfold he said defendant put a gun to his head demanding full compliance with his order, and then marched him to the washroom.

Clarence Tate, another customer, stated he was approximately six feet from defendant when the hold-up was announced. Robert Kunka stated he got only a glance at the robber before going to the washroom. Daniel Cunningham testified to the same circumstances of the robbery but stated he did not see the face of the man who announced the robbery.

Testimony was received as to the lights in the tavern consisting of four colored lights recessed in the ceiling over the bar, fluorescent lights in back of and below the bar,

lights on the juke box and bowling machine and in the rest room. Both robbers were unmasked and bareheaded. Both Kenney and Murn positively identified defendant as the robber who announced the hold-up, did all the talking, placed the gun to Murn's head and threatened Kenney. Tate testified that defendant resembled the person involved in the hold-up; Kunka stated he looked like the robber but he could not swear to it. Cunningham stated he did not see the robber's face. Kenney described the robber he identified as defendant as having light blond, reddish hair; Murn described him as having light red hair, a light complexion, a heavy build, and that he was about six feet tall; Tate stated he had red hair, was about six feet tall and weighed about 200 pounds; Kunka stated the robber's hair was blonde or reddish; Cunningham described his hair as light.

The defendant, a red head, testified he weighed 220 pounds now but that he only weighed 180 pounds three years ago. As an alibi he stated he was home with his wife on the night of the robbery. He argues that an alibi cannot be disregarded where the sole evidence contradicting it concerns the identity of the defendant, and that where the identification evidence is so weak as to leave a reasonable doubt as to the guilt of the accused the conviction cannot stand.

We agree with the principles cited by defendant but we disagree with the conclusions reached on the facts. The evidence offered on the lighting in the tavern leaves no doubt that it was sufficient to afford a clear view of defendant and permitted a positive identification. This is particularly true under the circumstances where the bartender, Kenney, had three opportunities to observe defendant closely, and Murn, likewise, had excellent opportunities to observe him during his argument about his billfold and when being escorted to the washroom with a gun to his head. As admitted by defendant the testimony of one eyewitness is sufficient to convict provided the witness is credible and the viewing of the

accused was under such circumstances as would permit a positive identification. (*People* v. *Brinkley*, 33 Ill.2d 403.) The fact that two other witnesses could not be positive and another stated he did not see the robber's face does not necessarily discredit the testimony of those who were positive. The time and opportunities that Kenney and Murn had to observe the robber and the fact that four of the witnesses agreed as to his heavy build, height, and light, reddish hair, all serve to lend credence to the identification. To the contrary, without supporting evidence or testimony, defendant's claim of alibi can be given little weight, for its worth is dependent wholly upon the credibility of defendant, and, measured by his testimony, which was in many instances vague, uncertain and unsatisfactory, there is little to inspire belief in his innocence or to lend credence to his claim of alibi. (*People* v. *Williams*, 17 Ill.2d 193.) We find that the State's evidence offered at the trial was clearly sufficient to establish the guilt of defendant beyond a reasonable doubt.

As to the out-of-court identifications it appears that sometime in 1966 or 1967, the exact time not being definitely established, the police showed a small 4″ x 4″ black and white picture of defendant to Kenney which he stated he recognized by the facial expression, stating, "This is the fellow." Approximately eight months before defendant's trial and about two years after the robbery, Tate and Cunningham attended a court hearing at which the defendant was identified by name as the one accused of robbing the tavern. On the morning of the trial, some three years after the robbery, Kenney, Murn, Tate and Cunningham were met by an assistant State's Attorney, and, in a room adjoining the court room, they were shown a photostatic copy of two sheets, each sheet containing a small photograph and sketch of defendant Martin, and a sketch and photograph of Banach, his alleged accomplice. As Murn and Tate passed through the courtroom they saw the defendant waiting trial.

Kunka also was shown a sketch of defendant just prior to trial. No one of the witnesses ever viewed defendant in a regular line-up.

Defendant contends that the viewing of defendant by Tate and Cunningham at the hearing was so suggestive and conducive to irreparable mistaken identity as to violate due process of law. He argues further that a post-indictment photographic identification is no different from a post-indictment line-up, that it, too, is a critical stage in defendant's prosecution and that to deny him the presence of his counsel constituted a violation of his constitutional rights.

We recognize the principles set forth in *United States* v. *Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert* v. *California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, that a post-indictment line-up is a "critical stage" in a criminal prosecution, and that the sixth amendment requires the presence of counsel if a subsequent in-court identification, influenced by that line-up, is to be admissible in evidence. We likewise recognize that in some jurisdictions it has been held that there is no substantial difference between a line-up of photographs of persons and a line-up of the persons themselves insofar as the constitutional safeguards required by *Wade* are concerned. (*United States* v. *Marson* (4th cir. 1968), 408 F.2d 644; *Thompson* v. *Nevada* (Nevada 1969), 451 P.2d 704.) However, we prefer the reasoning of *United States* v. *Ballard* (5th cir. 1970), 423 F.2d 127; *United States* v. *Robinson* (7th cir. 1969), 406 F.2d 64, and *McGee* v. *United States* (10th cir. 1968), 402 F.2d 434. Also agreeing with this conclusion is *United States* v. *Bennett* (2nd cir. 1969), 409 F.2d 888, wherein Justice Friendly stated, "to require defense counsel be allowed, or appointed, to attended out-of-court proceedings where defendant himself is not present would press the Sixth Amendment beyond any previous boundary. None of the classical analyses of the assistance to be given an accused suggests that counsel must be present when the prose-

cution is interrogating witnesses in defendant's absence even when, as here, defendant is under arrest; counsel is rather to be provided to prevent defendant himself from falling into traps designed by lawyers on the other side and to see to it that all available defenses are proferred * * *." Each of these cases concludes that the claim of impermissible suggestion is one that must be evaluated in the light of the totality of the surrounding circumstances. We agree, and hold that the defendant's constitutional rights were not violated merely by the absence of defendant's counsel at his out-of-court photographic identification.

The trial court denied defendant's motion to suppress identification but the State did not offer in evidence any of these out-of-court photographic identifications, so the next question is whether the in-court identifications were the products of those made out of court which were so suggestive as to give rise to irreparable mistaken identification. In *Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, it was recognized that the showing of suspects singly for the purpose of identification, and not as part of a line-up, was to be condemned, but it was held that a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it and is not *per se* improper. In *Simmons* v. *United States,* 390 U.S. 381, 19 L. Ed. 2d 1247, 88 S. Ct. 967, the Supreme Court stated that in spite of the hazards of initial identification by photograph it was unwilling to prohibit its employment, either in the exercise of its supervisory power or, still less, as a matter of constitutional requirement. Instead, it held that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photograph identification procedure was so impermissibly suggestive as to give rise to a very substantialy likelihood of irreparable misidentification. In *People* v. *Blumen-*

*shine,* 42 Ill.2d 508, we held that not every viewing of a suspect alone will be considered a denial of due process, that there may be justifying or saving circumstances such as the excellent opportunity of a victim to observe defendant at the time of the crime or where uncommon distinguishing characteristics of the accused were the principal means of identification. We concluded that even though an out-of-court procedure may have been unnecessarily suggestive, nonetheless, denial of due process depends on whether his identification at trial was dependent on or influenced by the improper viewing and that the question to be determined is whether the witness's identification had an origin independent of the improperly suggestive confrontation.

Considering the facts before us in the light of these rules, we find first that the viewing of defendant at the pre-trial hearing was neither improper, in the absence of any evidence of design, nor unnecessarily suggestive. The State has no duty, nor would it be practical, to conceal defendant from all potential witnesses throughout all preliminary hearings preceding an actual trial. As to the procedure whereby the State displayed defendant's photograph to the witnesses just prior to trial, we must state our strong disapproval. Nonetheless, in justice to society as well as to defendant, the question remains whether this questionable procedure unduly influenced the in-court identifications or whether their origins were independently based.

We recognize that much time elapsed between the crime and the trial and that time tends to fade memories. But this too is dependent upon the circumstances under which the witnesses observed the robbers at the time of the crime. Here the robbers made no effort to conceal themselves by masks or otherwise. They spent a leisurely one-half hour in the tavern ordering drinks and playing the bowling machine. As we noted previously, the tavern was adequately lighted enabling witnesses to obtain a clear view. Considering all the circumstances together, particularly the oppor-

tunity and length of time the witnesses had to observe defendant, the close and frightening contact with him that two of the witnesses experienced, and the general agreement of all witnesses as to his color of hair and other physical characteristics, there is little room for doubt that the identification of the defendant was correct notwithstanding the long delay between the crime and the trial and notwithstanding the fact that the out-of-court procedures employed were highly questionable. We therefore find that the in-court identifications of defendant were independently based and not unduly influenced by extraneous sources.

Defendant next contends that the trial court erred in permitting the State to impeach him on the question whether or not he was married at the time of the robbery. Without going into detail, but having reviewed the testimony, we find that it was proper for the State to impeach the defendant's claim, which was part of his alibi, that he was home with his wife at the time of the robbery. If he were not married at that time, as he later admitted, then this fact became material in assessing his credibility and testing the truth of his alibi.

Finally, defendant argues that he was denied equal protection of the law when he received a substantially greater sentence than did his alleged accomplice. We agree that a defendant should not be punished by a heavy sentence merely bcause he exercises his constitutional right to a trial. (*People* v. *Moriarty*, 25 Ill.2d 565.) But a mere disparity between a sentence imposed on a defendant who stands trial and another on one who pleads guilty does not of itself necessitate action by the reviewing court. (*United States* v. *Melendez* (7th cir. 1966), 355 F.2d 914.) It is the reason for the disparity that is controlling. Here there is no indication that the harsher penalty was imposed for refusing to plead guilty. Rather, the sentence appears to have been justified, for the record reveals that defendant was the moving force in the robbery. It was he who directed it and

it was he who brandished his gun menacingly, threatening the very lives of two individuals if they did not fully comply and conform to his orders and his whims. With such a man only a slim thread, an accidental move, or a harmless word, separates the crime of robbery from that of murder. We find that the trial court did not abuse its discretion in the imposition of defendant's sentence.

For the reasons stated we affirm the judgment of the circuit court of Cook County.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.