THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, *v.*
HAROLD OWENS, Petitioner-Appellant.

First District (1st Division) No. 61734

Opinion filed March 15, 1976.

1050

SIMON, J., dissenting.

Daniel R. Murray and Gregory G. Wille, both of Jenner & Block, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Donald M. Devlin, and Eugene J. Rudnik, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered opinion of the court:

Harold Owens (defendant) appeals from an order dismissing his post-conviction petition. Defendant was originally tried by the court without a jury. On September 1, 1970, he was found guilty of murder and sentenced to 15 to 25 years. On appeal to this court the judgment was affirmed. (*People v. Owens*, 5 Ill. App. 3d 420, 283 N.E.2d 292 (abstract opinion), *leave to appeal denied*, 52 Ill. 2d 596.) A summary of the factual background of his conviction and of the various legal matters before us is essential.

On January 31, 1970, Richard O'Neil was shot and killed in the front room of a cocktail lounge on the south side of Chicago. The deceased had been accompanied by Carter Russell who was the only eyewitness that testified in the subsequent trial. On February 7, 1970, Russell told the police that the killer was a male Negro, 17 to 18 years old, five feet eight or nine inches tall, weight 140 or 150 pounds, complexion medium brown to fairly light and wearing a tan overcoat. He was shown a book with "a lot" of photographs but made no identification. That afternoon the police showed Russell a group of 18 photographs of various persons, all depicting three separate views of each of the subjects. Russell examined each of these photographs and, after one viewing, he identified one of them, that of defendant, as being the perpetrator of the crime.

Police arrested the defendant on Sunday, February 8. He was placed in an impromptu lineup with four other men, all darker and heavier than he. On May 27, 1970, defendant was indicted for murder.

At the trial, Carter Russell testified that he had accompanied the deceased and another person to the cocktail lounge. Russell remained in the main room while the other two went into a rear room for some time. The deceased then returned and spoke to Russell. Then "six or seven fellows"

entered the lounge and walked directly to the back room. They returned shortly and one of them pointed out the deceased. One of these persons, identified by Russell as the defendant, Harold Owens, drew a gun and fired it. The witness testified that he heard two clicks but the gun did not fire. He testified that defendant then shot four more times and the weapon was discharged. The witness then "hit the floor" and all of the other persons ran out of the tavern. The witness saw no weapon in the hand of the deceased and heard no conversation between deceased and the other group. O'Neil died February 6, 1970.

Defendant denied guilt. He testified that he was in the basement of a home of a friend visiting one of her daughters on the day in question from 6 p.m. until 1 a.m. the following morning. He denied that he left at any time during that period. The home in question was approximately three blocks from the cocktail lounge. This testimony was partially corroborated by the mother of the friend with whom defendant spent the time in the basement. The mother was absent from the basement for a great part of the time in question. In stating his finding of guilt, the careful and able trial judge noted that the young lady did not testify although the record shows that she was physically present in the courtroom.

Defendant's case was capably and thoroughly presented to the trial court by his counsel. Defendant filed pretrial motions to suppress the identification on the ground that the police had suggested to the identification witness that the photograph of defendant be selected and also that the pretrial lineup violated his constitutional rights. After a full hearing, the court suppressed the evidence regarding the lineup but ruled that evidence of the identification by the photographs was competent and proper.

There was no evidence of suggestive conduct by the police with reference to selection by the identification witness of this photograph of defendant. The witness was subjected to a lengthy and thorough cross-examination. Counsel for defendant directed the attention of the witness to two particular photographs out of the group of 18. One of them was taken September 4, 1968. It has a pen and ink printed notation on the rear thereof showing that it depicts a man named Douglas Streeter. The other was taken February 10, 1969, and had defendant's name on the reverse side. The identifying witness selected the more current of these photographs and identified it as being that of the perpetrator of the crime. A police officer testified to some similarity of the other picture to the one selected by the witness as regards the jaw line, hair style and skin complexion. He stated that he had intentionally included both pictures for this reason. The witness, Carter Russell, testified that both pictures were similar but he was direct and positive in his identification.

Apparently all parties at the trial believed that the photos were actually

of two different persons. The similarity in the photos was mentioned by counsel and commented on by the court. Apparently believing that this fact may have strengthened the Russell identification, counsel for defendant stated that he would withdraw the motion to suppress the photographic evidence but that he wanted all of the photos to remain in evidence.

At some point after the conviction of defendant and after his unsuccessful appeals, he or his counsel ascertained that the picture labeled Douglas Streeter was actually that of defendant. Accordingly on August 21, 1972, defendant filed a motion for new trial directing these facts to the attention of the trial court. (Ill. Rev. Stat. 1973, ch. 110, par. 72.) This petition does not appear in the record before us. In connection with hearing of this matter, the parties entered into a complete stipulation concerning the two photographs. They stipulated that the police had the entire group of 18 pictures in their possession because of membership of these men in street gangs. The mislabeling of one of these pictures, actually of defendant, under the name of Douglas Streeter occurred accidentally and as a result of mistaken use of the wrong Central Booking number by a lockup keeper. They stipulated that during the examination of all of the photographs by Carter Russell in the police station, he did not look at the reverse side of any of them. He did not know the name of either of the persons upon the backs of the photographs in question until he was cross-examined at trial. The parties further agreed that these facts came to light almost two years after defendant's conviction.

At the hearing of this section 72 petition, the trial court expressed the opinion that disclosure of the correct name of the subject of the other photograph would not have made any difference in the finding of guilt which he reached at trial. The court stated that the mislabeling error involved an earlier picture of the defendant and that this picture did not have a similarity to defendant as great as the picture that was actually selected by the witness. The court accordingly denied the motion for new trial.

The current petition for post-conviction relief (Ill. Rev. Stat. 1973, ch. 38, par. 122—1 and following) was filed April 30, 1974. The People filed a motion to dismiss this petition setting forth that a notice of appeal had previously been filed from denial of the petition for new trial and that this denial was res judicata. In due course memoranda of law were filed and the motion to dismiss the post-conviction petition was denied. The People then filed an answer setting forth the prior adjudication alleging that the State should not be held responsible for the error in connection with the photographs and that the matters raised in the petition were evidentiary and procedural and did not enter into defendant's conviction. The parties agreed that there was no necessity for an evidentiary hearing in view of

their stipulation regarding the photographs. After hearing arguments, the court denied the post-conviction petition.

In the briefs before us, defendant urges that he was denied due process of law because of negligent suppression by the State of the true identity of defendant as the individual appearing in the photograph labeled "Douglas Streeter." Defendant also urges that he was denied due process in that the photographic identification procedures were so impermissibly suggestive as to raise a substantial likelihood of misidentification at trial. The State responds with the arguments that failure to disclose the true identity of the subject of one of the photographs among those viewed by the identification witness did not deny the defendant due process of law since this fact was neither favorable to the defendant nor material to the issue of his guilt. Regarding propriety of the photographic identification, the State urges that since these two photos were dissimilar and since the identifying witness had an independent and sufficient origin for his in-court identification, defendant was not denied due process of law.

Considering first the last stated contention of defendant regarding alleged suggestiveness in the photographic identification, we cannot agree with the initial statement by defendant that the mistake in labeling one of the photographs "shielded from scrutiny the suggestive procedure whereby Russell initially identified * * *" defendant. It is correct that there are dangers inherent in this practice as there are in many actions by police and other agencies. Nevertheless, full weight must be given to the statement by our Supreme Court that, "The practice of showing photographs of suspects to witnesses is essential to effective law enforcement." (*People v. Brown*, 52 Ill. 2d 94, 99, 285 N.E.2d 1.) The correct principle is that each case of photographic identification "must be considered on its own facts, and that convictions based on in-court identifications following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Brown*, 52 Ill. 2d 94, 99, citing *Simmons v. United States*, 390 U.S. 377, 382-85, 19 L. Ed. 2d 1247, 1252-54, 88 S. Ct. 967.

In the case before us, there is no evidence the police used suggestive methods or in any way influenced the witness in his identification. The witness gave an excellent and accurate description of the defendant to the police. He examined a large number of photographs and rejected them. He selected without hesitation the photograph of defendant appearing in the set of 18 pictures tendered to him. Defendant urges in his brief that the identification is unreliable because of the failure of Russell to see any resemblance between the picture of defendant and the erroneously labeled picture. This argument is contrary to the record. As shown, when

Russell was cross-examined by counsel for defendant, he freely admitted that the mislabeled picture was similar to the likeness of defendant and he testified expressly that the mislabeled picture was the only other photograph in the entire group which resembled defendant.

Actually, the only criticism which defendant levels against the photographic examination is the fact that it included more than one photograph of the defendant. Defendant urges that a recent decision of the Illinois Supreme Court "establishes clear precedent that it is impermissibly suggestive to include more than one photograph of defendant among photographs shown to an eye-witness for purposes of identification." In this regard defendant cites and depends upon *People v. Lee*, 54 Ill. 2d 111, 295 N.E.2d 449. This authority does not support defendant's assertion. In *Lee*, the police officer showed the witness nine photographs of Negroes. Included in this group was one picture of a woman and one picture of a suspect whom the witness had previously identified as a participant in the crime. Of the remaining seven, three were photographs of the defendant. As the Supreme Court stated, "It is difficult to imagine more suggestive circumstances surrounding a photographic identification." (54 Ill. 2d 111, 117.) We therefore disagree with the assertion made by defendant in his brief that *Lee* "should control the disposition of the present appeal."

We find no other authority cited by defendant to be decisive or even convincing on this point. *United States v. Zeiler* (3rd Cir. 1970), 427 F. 2d 1305, reversed a conviction primarily because defendant was denied effective legal assistance. The court characterized the photographic exhibition as "highly suggestive." Each of the witnesses was shown eight photographs of which three were of the defendant. These were all ordinary snapshots. Each of the remaining five pictures were the customary "mug shots" showing each suspect in full face and profile and bearing police markings. Also the pictures of defendant were the only ones in which the subject wore eyeglasses, as the perpetrator of the crime had done.

In *People v. Citrino* (1970), 11 Cal. App. 3d 778, 90 Cal. Rptr. 80, the court held the photographic procedure unduly suggestive. There, several months after the robbery and without previous identification, on the very day before trial, the eyewitnesses were shown five photographs of which three were of the defendant. One of these three was appended to a fingerprint card which indicated that the defendant had previously been convicted of another offense.

In our opinion, the correct principle applicable here is that the court must proceed on a case-to-case basis and scrutinize each photographic identification to determine whether it was in fact impermissibly suggestive. This principle was again recently stated by our Supreme Court in connection with a review of the *Simmons* decision. (*People v. Williams*, 60 Ill. 2d 1, 10, 322 N.E.2d 819.) In *Williams*, the crime was committed by

two black persons. The eyewitness looked at eight different photographs without examining the backs. The group included three pictures of the defendant and there was also a picture of another suspect. The court pointed out that the three photographs of defendant "were so dissimilar that it is not readily apparent that they are photographs of the same man." The court held "that this particular procedure was not suggestive, but the contrary might well be true had the photographs been more nearly alike." (60 Ill. 2d 1, 10.)

In the case before us, we find no element of impermissible suggestiveness. Only two of the 18 photographs were those of defendant. As examination of all of these photographs will show, there are points of similarity between the two but there are also points of difference resulting perhaps from the length of time between taking the two photographs, difference in the various poses and, in addition, possibly from differences in the equipment used in taking the pictures as well as the lighting. Thus, we would, as did the trial court, give credence to the statement by the eyewitness that the picture selected by him is far closer to the actual appearance of defendant than is the mislabeled photograph.

One further point requires discussion. Assuming for ease in exposition that the photograph identification procedure was impermissibly suggestive, the issue remains, to be determined from the totality of circumstances in the case, whether the identification testimony in court was based upon an origin sufficiently independent of the photograph identification. (*People v. Williams*, 60 Ill. 2d 1, 10, 11. See also *People v. Martin*, 47 Ill. 2d 331, 338, 265 N.E.2d 685, *cert. denied*, 403 U.S. 921, 29 L. Ed. 2d 700, 91 S. Ct. 2240.) In the case before us, when the trial court made his initial finding of guilty, he stated that the testimony of the eyewitness was, "clear, convincing, positive and credible * * *." The witness was unshaken and not impeached. The trial court repeated these conclusions when he denied defendant's petition for relief under section 72 of the Civil Practice Act. Our examination of the record convinces us that these statements by the trial court were completely correct and well founded. The record shows that the trial judge gave the entire proceedings most careful and undivided attention. Apparently he kept complete notes of the testimony. His analysis of the evidence was extremely well done and went to the heart of the matters before him. The testimony of the eyewitness was indeed exceptional in that it was clear, positive and convincing beyond reasonable doubt. An able and thorough cross-examination served only as an added basis for concluding that the identification was totally correct.

This record shows that this clear, positive and convincing identification testimony resulted from independent observation by the witness quite aside from the photographs he viewed. The witness saw defendant enter the tavern with the group. He was some 8 feet from defendant when the

shooting occurred. He saw defendant draw his gun and this must have caused him to focus his attention upon defendant. He heard the clicks of the two misfires and the four fatal shots. Before viewing any photographs, he gave the police a complete and accurate description of defendant which necessarily could have come only from his keen observation of defendant at the scene.

■■ When these facts are added to the convincing character of the testimony by the witness, the conclusion is inevitable that the identification here is true and accurate. A finding of the existence of a sufficient independent origin for the in-court identification is implicit within the denial of the motion to suppress the identification as well as in dismissal of the section 72 petition and the post-conviction petition. We cannot say that this result is contrary to the evidence.

We turn next to the first point raised by defendant concerning the actual effect upon the trial of the mislabeling of one of the photographs. We do not have here an issue of deliberate suppression of evidence requested by the defense or the intentional use of untrue matter by the prosecution. Thus, cases such as *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, cast little light upon the issues. This record discloses a simple mistake which is an unavoidable part of human experience in everyday life. However, it would be unfair to permit any result flowing from this mistake, which was of course in no sense the fault of defendant, to prejudice the absolute right of defendant to a fair trial.

With this in mind, the Federal courts have evolved a principle to be applied in situations of this kind involving inadvertent errors chargeable to the prosecution. This principle does not automatically require a new trial whenever it appears that "evidence possibly useful to the defense but not likely to have changed the verdict * * *" was inadvertently used. (*United States v. Keogh* (2d Cir. 1968), 391 F. 2d 138, 148. See also *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763.) On the contrary, it has been repeatedly held by the Federal courts in these cases of inadvertent or negligent nondisclosure, "that a new trial may be ordered only upon a showing that there is a significant chance that the nondisclosed item, developed by skillful counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Fried* (2d Cir. 1973), 486 F. 2d 201, 203, *cert. denied*, 416 U.S. 983, 40 L. Ed. 2d 759, 94 S. Ct. 2385.

The United States Court of Appeals cited in support of this decision *United States v. Miller* (2d Cir. 1969), 411 F. 2d 825, 831 and *United States v. Bonanno* (2d Cir. 1970), 430 F.2d 1060, *cert denied*, 400 U.S. 964, 27 L. Ed. 2d 384, 91 S. Ct. 366. In *Miller*, the court used language to the effect that where the prosecution has not discharged the duty of disclosure, "a motion for a new trial must be granted if there is a significant possibility

that the undisclosed evidence might have led to an acquittal or a hung jury; * * *." (411 F.2d 825, 831.) Another authority to this same effect states the requirement as being that the new evidence "would probably produce a different verdict in the event of a retrial." (*United Staves v. Kahn* (2d Cir. 1973), 472 F.2d 272, 287, *cert denied*, 411 U.S. 982, 36 L. Ed. 2d 958, 93 S. Ct. 2270.) In our opinion then, it is necessary that we analyze the effect of the admitted inadvertence upon the trial to determine if there is a significant chance that the nondisclosed item, developed by skillful counsel, could have induced a change in the result reached by the trier of fact.

Analysis must commence with examination of the questioned photographs. The properly labeled photos of defendant were taken February 10, 1969, and those labeled as Douglas Streeter were taken September 4, 1968. Each photo consists of three different poses. In the poses first at the left, the subjects are wearing different clothes, the position of their heads is not the same and it would indeed be difficult to say that they are of the same person. The same is true of both poses at the extreme righthand side. In one, the subject has his mouth open and in the other, it is closed. In both cases they are wearing different clothes. It would indeed be difficult to say that they are of the same person. As regards the center photograph, there are more similarities although the subjects are wearing different clothes. Careful study with the erroneous labeling in mind could evoke a question of similarity in the chin line of both of these subjects. The fact that the identifying witness, without knowledge of the error, pointed out a similarity between these two poses is a tribute to his powers of observation. Furthermore, both sets of photos differ strongly in the degree of darkness apparently resulting from different lighting, varying distances of the subjects from the camera or perhaps even from the camera equipment.

The entire matter must also be considered in the light of the quality of the identification testimony. The testimony of Carter Russell was most positive and definite. He is clearly a witness of intelligence with excellent powers of observation. This fact was recognized by the trial judge who saw and heard him testify and we believe that it will always be recognized by any impartial person who studies the record of the original trial. In addition, this record shows that the entire matter was brought out before the trial court at the time of the motion for new trial, made after the original appeals. The court gave most careful consideration to this issue. The court stated that he would have no hesitation in granting a new trial if he felt that the matter would have made any difference. The court then commented, as we have done, that there is a lesser degree of similarity between the two sets of photographs than there is between the photograph selected by the witness and the defendant himself. The court point-

ed out the opportunity of the occurrence witness to observe the defendant and also that the convincing nature of his testimony was sufficient for proof beyond reasonable doubt. In other words, the trier of fact in this case concluded for excellent reasons that there was no significant chance that the erroneous labeling of the picture could have induced a reasonable doubt in his mind. In the case before us we need not guess or speculate regarding the possible effect upon a jury if the photographs had been correctly labeled. The trial judge gave full and informed consideration to the possible effect of this situation upon the result he reached and concluded, properly in our opinion, that the result of the trial would not have been affected in any manner if the error had not been made.

It remains to analyze the three principal authorities depended upon by defendant. In our opinion, none of these cases constitute "persuasive precedent" for reversal as urged by defendant. In *United States v. Heath* (D. Hawaii 1957), 147 F. Supp. 877, in an income tax evasion case, defendant and his accountant turned over his books, papers and records to the government. These records were not available in response to defendant's discovery request and were therefore presumed lost. The trial court dismissed the indictment on defendant's motion. Since the lost records had a direct bearing on defendant's intent, and he would be unable to exculpate himself without them, it was clear that defendant was totally unable to prepare and then to present his case.

In *United States v. Consolidated Laundries Corporation* (2d Cir. 1961), 291 F.2d 563, the court of appeals reversed denial of a new trial to defendant. In a Sherman Act prosecution, the government had in its files various papers belonging to government witnesses. As a result of negligence these papers were never produced and given to the defendant. The court of appeals pointed out that these documents would have been essential in cross-examination of an important government witness who had contradicted his prior testimony and had been vague in his recollection. The court was of the opinion that this evidence went to the very heart of the issue of guilt and therefore its negligent suppression was inconsistent with the correct administration of criminal justice.

■■ In *Ingram v. Peyton* (4th Cir. 1966), 367 F.2d 933, the court of appeals granted habeas corpus in a situation where a defendant had been charged with robbery in a State court. This claim involved the sum of $8.50 and defendant had been sentenced to 20 years in the penitentiary. It developed that the chief witness for the State had previously been, convicted of perjury. The court held that the negligent misnaming of this witness in the indictment deprived defendant of an opportunity to ascertain and present this significant element of his defense. The court applied the principle that additional evidence "which is merely impeaching, cumulative or corroborating * * *" will not generally be grounds for new

trial unless the evidence is of a character to raise a substantial likelihood that it would have affected the result if known at the trial. We cannot agree that any of these Federal authorities constitute a strong precedent in support of defendant's contention.

■■ One additional point requires discussion although not expressly passed upon by the trial judge. The motion of the State to dismiss defendant's post-conviction petition raised the issue of res judicata. In our opinion, the allied doctrine of collateral estoppel should bar relitigation of the order appealed from. Recent decisions by the Supreme Court of Illinois have strongly established the doctrine of collateral estoppel which, in the absence of additional evidence or peculiar circumstances, bars relitigation of a matter previously decided in litigation between the same parties. This doctrine has been applied by the courts of Illinois in a wide variety of criminal cases. See *People v. Williams*, 59 Ill. 2d 557, 322 N.E.2d 461; *People v. Armstrong*, 56 Ill. 2d 159, 306 N.E.2d 14, and authorities therein cited.

In the situation before us, the rights of the parties to this litigation were fully heard and finally decided when the trial court passed upon the motion for new trial. The matter raised now, although given a constitutional label, involves the identical facts as the point previously decided in passing upon the motion for new trial. The decision of the trial court in that matter and the cogent reasons advanced in support thereof are equally applicable to and decisive of the same issues now sought to be raised under the guise of a constitutional violation.

We find no error in the order appealed from and it is accordingly affirmed.

Order affirmed.

BURKE, J., concurs.

Mr. JUSTICE SIMON dissenting:

Judges must be concerned over the danger that single-witness identification on occasion may result in conviction of innocent persons. This is true notwithstanding our obligation to follow the well-established rule, relied upon by this court in the direct appeal in this case, that identification by a single witness whose testimony is positive and credible is sufficient to sustain conviction. (See *People v. Henderson*, 36 Ill. App. 3d 355, 344 N.E.2d 239.) To avoid mistake in cases of single-witness identification, the accused should be afforded every opportunity possible to test the reliability of the identification.

I do not take issue with the majority's approval of the pretrial photographic identification procedures. I dissent because the State through

negligence, carelessness or oversight withheld from the defendant information favorable to him. The information withheld was that one of the 18 photographs presented by the State to its identification witness, Carter Russell, during the pretrial identification procedures and offered by the State at trial was incorrectly labeled. Each of the 18 photographs had a name on the back which presumably was the name of the person in the photograph. One of the photographs was inadvertently mislabeled by the police with the name Douglas Streeter. After trial and a direct appeal, it was discovered that this photograph was actually a photograph of the defendant taken 6 months before another photograph of the defendant included in the 18 offered. The more recent photograph of the defendant was correctly labeled and was identified by the witness as the assailant. The witness failed to select the earlier photograph as one of the assailant. The record does not show that the defendant examined the photographs before the evidence was discovered.

Russell was the only witness who placed the defendant at the scene of the murder, and identified him. The only other State witness, the deceased's mother, testified only to his excellent health prior to the shooting and to the date of his death. The State established no motive for the killing; there was no evidence that the victim knew the defendant and five or six men who Russell testified accompanied the defendant at the time of the murder, and no hint was given as to their identity or fate; no murder weapon was produced; neither an individual who accompanied the defendant and the witness to the tavern where the murder took place and who was there at the time nor any other persons who may have been in the tavern were called as witnesses.

Russell's credibility and perceptive powers were the only real issues in the case. When defense counsel failed to impeach Russell, the defendant had little hope of acquittal. In explaining at the end of the trial the decision he reached, the trial judge commented that Russell "was so unshaken he was not impeached." This appraisal of the witness was quoted by this court in its opinion on direct appeal. However, the discovery that the photograph labeled Douglas Streeter was actually a photograph of the defendant indicates that the unshaken witness may have some infirmities.

Russell when shown the mislabeled picture at trial testified he did not know who the person was. He also testified that although the mislabeled picture looked similar to the defendant, there was just one picture of the defendant in the group of 18 photographs he was shown, the one he selected. Had the State disclosed that both photographs were of the defendant, his counsel could have cross-examined Russell on his failure to identify both photographs as the assailant. It is not possible, of course, to know retrospectively how Russell would have reacted when confronted with this fact on cross-examination. He might have emerged unscathed or

even strengthened. But, the mislabeled photograph, in the hands of skillful counsel, might have affected the positiveness of Russell's identification. Confronted by persistent cross-examination revealing that the photograph of the person he testified he did not know and was not the defendant was in fact the defendant, Russell demeanor and testimony might have become uncertain and confused rather than remaining positive, unshaken and unimpeached. Notwithstanding the detailed explanation in the majority opinion of the differences the majority observes between the photograph Russell identified as the defendant and the mislabeled one, there is no certainty that Russell's explanation on cross-examination would have been equally persuasive, certain or articulate. If, instead of being misled by the State's error, defense counsel was armed with knowledge that both photographs were of his client, there is a possibility that he could have shattered Russell's claim that he could positively identify the assailant.

I disagree with the majority view that cases such as *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, "cast little light upon the issues in this case." *Brady* and the cases which rely and expand upon it are at the very heart of the issue raised by this post-conviction petition. (*Levin v. Katzenbach* (D.C.Cir.1966), 363 F.2d 287, 290; *Barbee v. Warden of Maryland Penitentiary* (4th Cir. 1964), 331 F.2d 842, 846.) The inadvertently omitted evidence had a bearing on Russell's credibility. It could have been helpful in cross-examining him, and thus was favorable to the defendant within the requirements of *Brady*. (*People v. Dixon* (1974), 19 Ill. App. 3d 683, 312 N.E.2d 390.) Failure of police to reveal material evidence in their possession is harmful to a defendant when it is negligently as well as purposefully withheld. *Barbee v. Warden of Maryland Penitentiary* (4th Cir. 1964), 331 F.2d 842, 846.

The majority opinion seizes upon language in *United States v. Fried* (2d Cir. 1973), 486 F.2d 201, 203; *United States v. Kahn* (2d Cir. 1973), 472 F.2d 272, 287; *United States v. Miller* (2d Cir. 1969), 411 F.2d 825; and *United States v. Keogh* (2d Cir. 1968), 391 F.2d 138, 148, as authority for placing a burden on the defendant to show that had information withheld as the result of inadvertence or error been available at trial the outcome would have been different. All that is necessary to bring *Brady* into play is that the evidence be favorable to the accused and material; when those requirements are satisfied it is of no consequence whether the withholding was in good faith or in bad faith. The language quoted by the majority from *Fried, Kahn, Miller* and *Keogh* is not helpful in disposing of the post-conviction petition in this case without a detailed analysis of the facts in each case which are completely different than those presented in this case. Suffice it to say that in *Miller*, the case relied on by the majority with facts most similar to those in this case, the court granted a new trial on the

ground of nondisclosure of evidence after stating that it could not "confidently say what effect it might have had on the outcome of the trial." The court pointed out that had the undisclosed evidence been available to counsel there was a possibility that "the sanctity of the oath and effective cross-examination might lead" the witness to recant his identification or at least to admit doubt. The court recognized the difficulty of speculating whether the undisclosed evidence could have brought about a different result in the following remarks which are responsive to the approach the majority has taken in this case:

> "We have reached this conclusion with some reluctance, particularly in light of the considered belief of the able and conscientious district judge, who has lived with this case for years, that review of the record in light of all the defense new trial motions left him 'convinced of the correctness of the jury's verdict.' We, who also have had no small exposure to the facts, are by no means convinced otherwise. The test, however, is not how the newly discovered evidence concerning the hypnosis would affect the trial judge or ourselves but whether, with the Government's case against Miller already subject to serious attack, there was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction. We cannot conscientiously say there was not. With the panoply of rules that our legal system has devised to insure fairness in criminal trials, the least appropriate instance for a grudging attitude in applying them would be one where a defendant * * * has steadfastly asserted that the prosecution got the wrong man * * * ." *United States v. Miller* (2d Cir. 1969), 411 F.2d 825, 832.

Neither can I conscientiously say that there was not a "significant chance" that Russell, who admitted he panicked immediately after seeing the defendant and hit the floor and was unable to describe in any detail the men he claimed were defendant's accomplices, would have been shaken on cross-examination or that he might have admitted doubt about the identification after learning that a photograph he had testified was not that of the defendant was in fact the defendant. It should also be noted that Russell never saw the defendant before the murder, and the episode lasted only a few minutes. That the majority believes Russell had "excellent powers of observation" and was intelligent does not serve as a satisfactory substitute for cross-examination which would have revealed the certainty and honesty of his identification when confronted by the errors in his testimony. Any conclusion by this court or the trial judge that confrontation of Russell with the truth about the mislabeled photograph would have made no difference in the positiveness of his identification is

speculative. (*Levin v. Clark* (D.C.Cir. 1967), 408 F.2d 1209, 1212, 1215.) The question is not whether, as the majority opinion states, there was any significant chance that the erroneous labeling when disclosed to the trial judge could have induced a reasonable doubt in his mind, but whether additional cross-examination to which Russell was never subjected might have induced such doubt. As this court pointed out in *People v. Dixon* (1974), 19 Ill. App. 3d 683, 688:

> "The defense had a right, as noted above, to have this evidence made available to it at the time of the request. It is not this court's purpose to speculate as to what use the defense could or would have put the evidence in question, or what additional evidence it may or may not have led to, had it been turned over prior to trial."

An ironic feature of this unusual case is that the mislabeled photograph was pointed to by the trial court to buttress the conclusion that Russell was a stellar identification witness. In fact, comment was made on Russell's perceptiveness in being able to discern between the similar appearance of the individuals portrayed in the two photographs. Had the error been known to defense counsel, the mislabeling instead of bolstering Russell's positiveness in the eyes of the court might have destroyed his testimony. Since there is no way other than by speculating that the trial judge or this court can conscientiously say there was no significant chance this may not have happened, the defendant should be granted a new trial.

The majority's view that the issues raised by the post-conviction petition were disposed of in the denial of the defendant's section 72 motion overlooks the difference in standards applicable to a motion for a new trial and a claim of violation of constitutional rights by withholding information under the test of *Brady*. In the former, the court decides whether with the new evidence before it the decision would have been different. In the case of this post-conviction petition based upon a claimed constitutional deprivation, the issue raised is whether disclosure of the withheld information prior to trial could have enabled the defendant to develop additional testimony not presented to or considered by the trial court which could have affected the posture of the case. Thus, for the purpose of the section 72 motion the court could properly decide whether having in evidence the fact that the mislabeled photograph was one of the defendant would have affected the court's belief that the conviction was proper. The issue to be decided in this post-conviction petition is whether knowledge that the mislabeled photograph was defendant's might have enabled the defendant to develop additional evidence which has not been presented to the court and which might have affected the outcome of the case. The doctrine of collateral estoppel is, therefore, not applicable.