THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD PHILSON *et al.*, Defendants-Appellants.

First District (5th Division)   No. 77-1717

Opinion filed April 12, 1979.

James J. Doherty, Public Defender, of Chicago (Vito A. Colucci and Suzanne M. Xinos, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendants Donald Philson and Ray A. Hodges were convicted of robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—1) and sentenced to probation plus, respectively, six months and 90 days considered served. On appeal, they contend (1) that the trial court erred when it denied their motion to quash their arrest and suppress all resulting identifications, (2) that certain identification procedures were so suggestive as to deny them due process of law and fatally taint all in-court identifications, and (3) that they were not proved guilty beyond a reasonable doubt.

At the hearing on defendants' motion to quash the arrest and suppress the resulting identifications the following pertinent evidence was adduced.

*Defendant Ray Anthony Hodges*

At approximately 3 a.m. on January 13, 1976, he and defendant Philson were arrested as they came out of David Bird's apartment at 2501 West Monroe. Neither he nor Philson were violating any laws just before they were arrested, and the arresting officer did not show them an arrest warrant. He, Philson and Bird were taken to a police station and placed in a lineup. At the time of his arrest, he was wearing a tan three-quarter length coat.

*Robert Kalbfell—Chicago Police Officer*

At 12 a.m. on January 13, 1976, he and his partner, Officer Belcik, began patrolling their "beat." Previously, at roll call, he was notified that a CTA bus had been hijacked and taken into the "project area" on Monroe Street, and that a number of people on the bus had been robbed. He was given descriptions of the individuals involved. He and his partner talked to a man who had given them information in the past. The informant told them that he had been in "Joe's Hello Lounge" at 2453 West Madison and had heard three men bragging that they had committed the robbery. Approximately half an hour later they talked to another informant they had used in the past. He told them that he also heard three men in "Joe's Hello Lounge" bragging about committing a bus robbery. The informant identified one of those three men as David Bird, and told them that his address was 2501 West Monroe, apartment 101. They went to that address, knocked on the door, and were told by Bird's father that David was not home. They conducted a surveillance and an hour or hour and a half later observed two male Negroes, identified as defendants Hodges and Philson, emerge from the apartment. Hodges was a male Negro, 20-25 years old, 185 lbs., wearing a green Army jacket, black hat, and dark trousers. This matched the description of one of the offenders that he had heard at roll call and seen in the case report on the bus robbery. They stopped Hodges and Philson "and immediately performed a protection patdown." As they did this, David Bird's father came to the door and said that his son was trying to escape through the back window of the apartment. They seized Bird and took him, Hodges and Philson to the 13th District station, where a lineup was later held.

On cross-examination, he admitted that during their surveillance of the apartment, they had to leave on occasion to handle calls. He acknowledged that when they and other officers, who had their guns drawn, stopped the defendants outside the apartment building, defendants did not attempt to run away. He conceded that the informant who named David Bird gave only a "vague" description of the other two men and that his police report states that "further investigation of this information disclosed that one of the offenders may be David Bird."

Following this hearing, defendants' motion to quash their arrest and suppress the resulting identifications was denied. The cause then proceeded to trial, at which the following pertinent evidence was adduced.

*For the State*

*Robert Kalbfell, Chicago Police Officer*

He substantially repeated his testimony given at the hearing on the motion to quash the arrest.

*Patricia Gayles*

On January 12, 1976, at approximately 10:30 p.m., she was riding in the back of a brightly lit CTA bus travelling west on Madison Street. At Madison and Western "a crowd of guys" got on the bus. One of them said "This is a stickup" and told them to put their watches and rings on the floor. Two of the men, one of whom she identified in court as defendant Philson, came to where she was sitting and began to take the passengers' wallets, purses, and other belongings. The men then went up to the front of the bus. Philson said that the bus driver still had his wallet, and he took it from him. One of the other men hit the bus driver and took the phone off the wall. The men then got off the bus. On March 15, 1977, Investigator Lloyd of the Chicago Police Department came to her home and showed her two photographs of lineups. From these photographs, she positively identified Philson as one of the men who boarded the bus on January 12, 1976.

On cross-examination she stated that at the time she viewed the photographs, she had not been to court on this case, had not talked to any police other than Investigator Lloyd, and did not know if any of the other bus passengers had made any identifications. She did not remember whether, on the night in question, she gave the police a description of the offenders. She acknowledged that some of the men on the bus wore long coats, and that Philson was the only man in the lineup photographs she looked at who was wearing a long coat. She admitted that nothing was taken from her during the incident, despite her statements to the contrary to the police. She acknowledged that during the robbery she talked to her brother and her girl friends.

Ida Harges, Felecia Love and Cheryl Lynn Gilmore substantially corroborated Gayles' account of the robbery, and added the following pertinent evidence.

*Ida Harges*

The bus was "very bright" because "all [the] lights were on." She identified defendants Hodges and Philson as two of the men involved in the robbery. She saw Hodges take money and purses from the people in the back of the bus. Another man, who was not in court, took her purse and went through it. She estimated that the robbery took 20-25 minutes. During the robbery, Hodges passed her several times and faced her, and she watched him for "a good five minutes." On January 14, 1976, at approximately 3 a.m., she viewed a lineup.

On cross-examination, she conceded that she identified a "Cox" and "Byrd" at the lineup she viewed and that although Philson and Hodges "might have been" in the lineup, she did not identify them. She acknowledged that two days before testifying, on March 21, 1977, one of the State's Attorneys showed her a photograph of the lineup. Mr. Wright,

who was the bus driver on the night in question, Mrs. Gayles, her cousin, Mrs. Love and Miss Gilmore were in the same room with her at that time, and she was present when the photograph was shown to them. She admitted that she told the State's Attorney that defendants were in the photograph.

On redirect examination she stated that she had been to court on this matter four previous times, that she had previously told the State's Attorney that she could identify defendants, and that when she was shown the photograph on March 21 she was not told to identify anyone.

*Felecia Love*

She identified defendant Hodges as one of the offenders. The lighting conditions on the bus were "bright" and she watched Hodges take money and wallets from people for about five minutes. Her purse was taken that night and was returned to her at the police station two days later, minus $5 that she had in it.

On cross-examination, she could not recall what Hodges was wearing, and conceded that he did not take anything from her. She acknowledged that she identified Hodges for the first time when she viewed a photograph of a lineup on the previous Monday, March 21, 1977. Her cousin Miss Harges and three other witnesses, were present at that time and she heard what they said when they looked at the photograph.

On redirect examination she stated that when she was shown the photograph referred to, nobody told her to pick anybody out.

It was stipulated by the State and defendants that on January 14, 1976, Ida Harges and Felecia Love viewed a lineup in which defendants stood, but that neither woman identified either of the defendants.

*Cheryl Lynn Gilmore*

She identified defendant Philson as the man who took her purse and wallet. Under "bright" lighting conditions, she saw defendant Philson ask other people for wallets and money, hit the bus driver, and then leave the bus with the other offenders. On March 15, 1977, Investigator Lloyd came to her home and showed her photographs of lineups. This was the first time she had been asked to identify anyone, and she identified defendant Philson.

On cross-examination she stated that she did not remember what any of the offenders wore during the robbery. She denied ever expressing any doubt to Investigator Lloyd about her identification of Philson. She denied ever talking with other witnesses about identifications of the offenders. She admitted that she viewed photographs again on March 21, 1977, but denied that any other witnesses were present when she did so.

*Cedric Wright—CTA Bus Driver*

On January 12, 1976, at approximately 10:30 p.m., he was driving his

fully lit bus westbound on Madison Street. At Madison and Western, seven passengers boarded the bus. Three paid their fares, the next three handed him invalidated transfers, and the last man, whom he identified as "Byrd," pulled out a gun and announced a "stick up." He identified defendants Philson and Hodges, in court, as two of the men who boarded the bus. "Byrd" directed him to drive along a diverted route, and to stop at Rockwell and Adams, where another man boarded the bus. The offenders remained on the bus for 10 to 15 minutes. During this time, he was able to observe defendants Hodges and Philson through the bus' rear view mirrors. He saw Hodges taking purses from ladies seated in back of the bus, and also saw Philson picking up valuables that were on the bus floor. Afterwards, Philson and another man came up to him, took his watch and wallet, and appeared to be very angry that he "hadn't given up" those items by then. The man next to Philson asked Wright if he knew him. When he responded that he did, Philson struck him, ripped off the telephone receiver, and threw it at him. The men then left the bus. On January 13, 1976, he viewed a seven-man lineup at the 13th District, Chicago Police Station, and identified Hodges, Philson and "Byrd." No police officer told him to identify any or all of the people.

On cross-examination he conceded that after he viewed the lineup and made his identifications, he asked a police officer if he could "go sit somewhere else and came [sic] back a second time." He explained that he did this "for their benefit" and that even though he was positive about his identifications, he "like[s] to take two looks at everything." A police officer took him to a room and brought him back to the lineup about 20 minutes later. He again identified Philson, Hodges and "Byrd." He denied that when he looked or "peeked" in his rear view mirrors at various times during the robbery, he saw only the backs of the offenders. He stated that he saw them in the mirrors in various profiles and positions, including a full face view of Hodges. He acknowledged that on March 21, 1977, he viewed lineup photographs in the presence of other witnesses and heard what those witnesses said when they viewed the photographs. He did not notice anything unusual about Hodges as he was depicted in any of the photographs.

*For the Defense*
> *Wayne C. Lloyd, Chicago Police Investigator*

On March 15, 1977, he went to Cheryl Gilmore's house and showed her photographs of the lineup held on January 13, 1976, in connection with the bus robbery. Miss Gilmore made an identification, but said she couldn't be positive about it. He also showed the photographs to Patricia Gayles, who made an identification. He was present when the lineup was

held and recalled that Mr. Wright, the bus driver, viewed the lineup only once, and made certain identifications.

On cross-examination, he stated that neither Miss Gilmore, Miss Gayles nor Mr. Wright were told whom to identify.

OPINION

Defendants first contend that the trial court erred in denying their motion to quash their arrest and to suppress all resulting identifications. As defendants correctly point out, when an arrest is invalid, all subsequent identifications directly traceable to the unlawful detention are inadmissible. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Bean* (1970), 121 Ill. App. 2d 332, 257 N.E.2d 562.) However, a warrantless arrest such as the one in the instant case is valid where the arresting officer has probable cause to believe that the persons arrested have committed a criminal offense. (*People v. Lakins* (1977), 52 Ill. App. 3d 284, 367 N.E.2d 592.) Defendants point out that they were not committing an offense when they were arrested, nor did they attempt to flee as the police approached. They further emphasize that although the police informant named Robert Bird, he did not name the other two offenders and gave only a "vague" description of them. Defendants therefore argue that their arrest was made without probable cause.

■■ ■ We disagree with their argument. Whether or not probable cause exists in a particular case depends on whether the totality of the facts and circumstances known to the officers when the arrest is made are sufficient to warrant a man of reasonable caution to believe that the arrested persons committed a criminal offense. (*People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195.) In determining the presence of probable cause, courts are not disposed to be unduly technical, but rather deal with probabilities which are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. (*People v. Lucus* (1968), 41 Ill. 2d 370, 243 N.E.2d 228.) Accordingly, we stated in *People v. Mills* (1968), 98 Ill. App. 2d 248, 254, 240 N.E.2d 302, 305, that:

> "The actions of a policeman in making an arrest are to be judged by the factual considerations of everyday life; and any assessment of the reasonableness of an arresting officer's conduct should take into consideration the responsibility of the police to prevent crime and to apprehend criminals along with the fact that they often must act on a quick appraisal of the data before them."

At the time of the arrest in this case, Officer Kalbfell knew that a robbery had occurred a few hours before and a short distance away. Two

informants, who Officer Kalbfell indicated had been reliable in the past, stated that three men had been seen and heard bragging about the robbery a short distance away from where it occurred. One of the informants gave the name and address of Robert Bird. When Officer Kalbfell observed defendants emerge from Bird's apartment he realized that defendant Hodges matched the description given to him a few hours earlier at roll call regarding one of the offenders' race, height, weight, approximate age, and dress. This realization and defendants' emergence from Bird's apartment were clearly sufficient to support a conclusion by the officer that defendants were the two men who the informants referred to as being with Bird and bragging about the robbery. This conclusion, plus the physical factors referred to, reasonably supported the officer's decision to arrest defendants at that point. We note that when a trial court has held a hearing on a motion to suppress, weighed the evidence and concluded that the police did have probable cause to arrest, a reviewing court will not disturb that finding unless it is manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) Based on the totality of the circumstances and factors referred to above, we will not disturb the trial court's decision that Officer Kalbfell had probable cause to arrest defendants, and that the resulting identifications should not be suppressed.

■■ Defendants next contend that the photographic identification procedures used in this case were so impermissibly suggestive as to deny them due process of law and fatally taint all in-court identifications. Photographs of a lineup in which defendants stood were shown to witnesses Gilmore and Gayles on March 15, 1977. The same photographs were apparently shown to all witnesses on March 21, 1977, which was the Monday before trial. Defendants initially argue that these photographs were suggestive as to Philson because he was the only man in the lineup who wore a long coat, as some of the offenders did during the robbery, and also because he was in custody when the photographs were shown, and should therefore have only been identified in person. Contrary to these assertions, however, we note that where the identification procedure is not conducted in an impermissibly suggestive manner, the use of photographs to identify a defendant is not prohibited even when he is in custody and able to be viewed in person. (See *People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) Moreover, any complaint that there were differences between the appearance of defendant and the other lineup participants goes to the weight of the evidence, rather than to its admissibility. (*People v. Norfleet* (1972), 4 Ill. App. 3d 758, 281 N.E.2d 761.) The fact that Philson was the only man in this lineup wearing a long coat after "some" of the offenders wore long coats does not establish that

the lineup was impermissibly suggestive and that all identifications would be fatally tainted. (See *People v. Davis* (1974), 21 Ill. App. 3d 177, 315 N.E.2d 79; *People v. Wicks* (1969), 115 Ill. App. 2d 19, 252 N.E.2d 698.) Defendants further argue, however, that the entire photographic showing on March 21 was impermissibly suggestive because the photographs were shown to each witness in the presence and hearing of all other witnesses. Citing *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017, they argue that this procedure was so suggestive that it denied them due process of law. As further support for this contention, they point to the facts that the photographic showing took place 14 months after the offense, and that although Ida Harges and Felecia Love identified. defendants at the photographic showing and at trial, they had failed to identify either defendant at the lineup that was held shortly after the crime. Defendants conclude that the witnesses' in-court identifications were tainted results of the impermissibly suggestive photographic identification procedures, and should neither have been admitted nor relied upon to establish their guilt.

We reject this conclusion. We note initially, regarding Harges and Love, that a failure to identify a defendant at a lineup does not negate the credibility of a later identification. (*People v. Evans* (1976), 42 Ill. App. 3d 902, 356 N.E.2d 874.) Further in *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, the United States Supreme Court held that each case in which a photographic identification procedure was conducted must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on the ground only if the photographic identification procedure was so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This rule was cited by our supreme court in *People v. Martin* (1970), 47 Ill. 2d 331, 265 N.E.2d 685, *cert. denied* (1971), 403 U.S. 921, 29 L. Ed. 2d 700, 91 S. Ct. 2240, in which defendant contended that several in-court identifications were the products of impermissibly suggestive pretrial photographic identification procedures. Unlike the instant case where a photograph of a lineup was shown, the witnesses in *Martin* were shown photographs of only defendant and his alleged accomplice some two years after the offense and immediately before trial. The supreme court referred to the State's out-of-court identification procedures as "highly questionable," stated its "strong disapproval" of the showing of defendant's photograph to the witnesses just before the trial, and recognized that "much time elapsed between the crime and the trial." (47 Ill. 2d 331, 338, 265 N.E.2d 685, 689.) The court ruled, however, that:

"[E]ven though an out-of-court procedure may have been

unnecessarily suggestive, nonetheless, denial of due process depends on whether his [defendant's] identification at trial was dependent on or influenced by the improper viewing and * * * the question to be determined is whether the witness's identification had an origin independent of the improperly suggestive confrontation." (47 Ill. 2d 331, 338, 265 N.E.2d 685, 689.) Citing the witnesses' close proximity to defendant during the offense as well as the opportunity and length of time they had to view him, the court concluded that the in-court identifications were independently based and not unduly influenced. (47 Ill. 2d 331, 339, 265 N.E.2d 685, 689.) In *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017, relied upon by defendants herein, three witnesses viewed defendant in a lineup together, and identified him in each other's presence. Although our supreme court found that this procedure was suggestive, it repeated the rule that where a witness had an opportunity to observe and there is little likelihood of a mistaken identification, a conviction based upon a subsequent in-court identification will not be set aside. (53 Ill. 2d 261, 273, 291 N.E.2d 161, 168.) After reviewing the record, the *Burbank* court concluded that the witnesses had an adequate opportunity to observe defendant at the time of the offense, and that there was therefore little likelihood that the suggestive pre-trial procedure led to a mistaken identification. See also *People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720.

■ We reach a similar conclusion in this case. The robbery described by the witnesses took between 10 and 25 minutes. During this time defendants, who made no effort to conceal or mask their identities, walked up and down the bus and were in close proximity to the witnesses. In corroborating each other's accounts of the robbery, the witnesses specifically agreed that the bus was brightly lit by the lights which were on inside it. In light of all these circumstances, we conclude that the witnesses clearly had an independent basis for their in-court identifications, and that there is very little likelihood that those identifications were tainted by the pretrial identification procedures.

■■ Finally, defendants contend that the identification testimony referred to above was not sufficient to prove them guilty beyond a reasonable doubt. Our supreme court has repeatedly held, however, that a positive identification by even a single witness with ample opportunity to observe is sufficient to sustain a conviction. (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866.) As we indicated above, the eyewitnesses to the crime had ample opportunity to observe defendants. Their identifications were positive and their accounts of the robbery were consistent on all major points. We

conclude that the evidence was more than sufficient to support defendant's convictions beyond a reasonable doubt. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.